# EXHIBIT B

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ALASKA

3

4     ------------------------------------------------------

5     TESORO ALASKA COMPANY,      )
                                  )
6                   Plaintiff,    )   No.  3:06-CV-00020-TMB
                                  )
7            v.                   )
      ST. PAUL FIRE AND MARINE    )
8     INSURANCE COMPANY,          )
                                  )
9                   Defendant.    )

10    ------------------------------------------------------

11

          30(b)(6) DEPOSITION UPON ORAL EXAMINATION
12
                            OF
13
                    SHELLEY R. CARDIEL
14
          REPRESENTING PARKER, SMITH & FEEK, INC.
15

16    ------------------------------------------------------

17                    July 31, 2006

18                     9:30 a.m.

19             601 Union Street, Suite 3100

20               Seattle, Washington

21

22

23

24                 JANICE L. TEGARDEN

25             CERTIFIED COURT REPORTER

30 (B) (6) DEPOSITION OF SHELLEY CARDIEL, 7/31/06

Page 119

1    MR. SUTHERLAND: Yeah.
2
3            (Off the record for one
4            minute at 2:30 p.m.)
5
6    Q. (By Mr. Sutherland) The question is, can you explain why
7       there's an original handwritten sticky note on what
8       obviously is a copy of something out of one of these
9       original file folders you brought?
10   A. A copy of the Tesoro certificate issued on 2-18 was
11      obviously pulled from the file and Steve White was
12      providing a copy of this to somebody internally confirming
13      to them that this was the first certificate that had ever
14      been issued to Tesoro.
15          So this was obvious added in November of some year,
16      there's no year, but I'm assuming it's 2005, was added
17      to -- the note was added to this copy, and then it appears
18      the copy was returned to me.
19   Q. Okay. And in looking at that original note there, it's
20      Steve White's handwriting in blue but then there's somebody
21      else's handwriting, or is that also his?
22   A. That's still Steve White's handwriting.
23   Q. And that's in red ink and it's got an "11-29"?
24   A. Right.
25   Q. And what is it?

Page 120

1    A. "Shelley returning to you."
2    Q. All right.
3    A. And it's possible that that's Ed's handwriting but I can't
4       tell.
5    Q. Oh, you don't know if that's his?
6    A. Yeah, I don't know which of them wrote that.
7            MS. KILLIAN: Referring to the
8       red?
9            MR. SUTHERLAND: The red.
10           THE WITNESS: Referring to the red.
11   A. The other is definitely Steve White's handwriting.
12   Q. (By Mr. Sutherland) And you do recall in November 2005
13      that there was within Parker, Smith & Feek a discussion
14      about how this additional insured endorsement certificate
15      of insurance came to be?
16   A. There was discussion from October until --
17   Q. Yesterday or Friday?
18   A. Yes, until Friday about that fact.
19   Q. Okay. So does that refresh your recollection about whether
20      there may have been this ongoing relationship between
21      Wilder and Tesoro but that only on 2-9 did Tesoro request
22      to get proof of the insurance or something like that?
23   A. That's the first time we were ever asked and the first
24      time, to my knowledge, that a certificate was ever issued
25      to Tesoro.

Page 121

1    Q. I'd like to focus your attention on the terms of the G0322
2       form that we've seen in terms of what person or
3       organization is being added.
4           The wording changed a little bit, but you're familiar
5       enough with this form to know that the printed part of it,
6       as opposed to the typewritten part, that did not change
7       over all this period of time, did it, because it was always
8       the same "G0322 Revised 12-97" form?
9            MS. KILLIAN: I just want to make
10      an objection for clarification. We've
11      talked about a number of periods of
12      time, so when you say, "all this period
13      of time?"
14           MR. SUTHERLAND: I'm sorry because
15      I wasn't waiving.
16   Q. (By Mr. Sutherland) All the policy files you've brought
17      with you today?
18   A. All have that form --
19   Q. Yes.
20   A. -- number and edition date.
21   Q. All right. So in each of those policy periods and then
22      attached to each policy is the requirement that the person
23      or organization named below, and that's in this typewritten
24      description, is "An additional protected person as required
25      by a contract or agreement entered into by you," meaning

Page 122

1       Wilder?
2    A. Correct.
3    Q. "But only for covering injury or damage arising out of" and
4       then there's four bullet points; is that correct?
5    A. Correct.
6            MR. CLARKSON: Object to the form
7       of the question, but go ahead.
8    Q. (By Mr. Sutherland) One of those bullet points says, "Your
9       work for that person or organization."
10          Now, you understood that "your work" refers to
11      Wilder's work under the terms of this form?
12   A. Yes.
13   Q. So that would mean Wilder's work for the person that you
14      agree to add as an additional protected person?
15           MR. CLARKSON: Object to form.
16   Q. (By Mr. Sutherland) Is that right?
17   A. Yes.
18   Q. So in the case of the Tesoro certificate that you're
19      providing, at least with respect to this first bullet
20      point, you'd agree that Tesoro is an additional protected
21      person only for covered injury or damage arising out of
22      Wilder's work for Tesoro"?
23           MR. CLARKSON: Object to form.
24           MS. KILLIAN: Join.
25   A. I can't really answer that that way, though, because the

35 (Pages 119 to 122)

30 (B) (6) DEPOSITION OF SHELLEY CARDIEL, 7/31/06

Page 126

1    thereabouts, when you learned that Tesoro wanted you to
2    send another certificate, that everything somehow worked
3    out?
4            MR. CLARKSON: Object to form.
5    Q. (By Mr. Sutherland) Can you jump to that conclusion or
6    not?
7    A. No.
8    Q. Okay.
9            MR. SUTHERLAND: I'm not sure how
10            you want to handle this little note but
11            I think it would be useful to make the
12            page, make it Exhibit 3A of just this
13            one page with the sticky on it and then
14            we'd have a page maybe without the
15            sticky as part of No. 3?
16            MS. KILLIAN: I was thinking of
17            making the sticky a separate exhibit.
18            MR. SUTHERLAND: A totally
19            separate exhibit. So make the sticky as
20            Exhibit 3A and color copy it.
21            MR. CLARKSON: That would be
22            great.
23
24            (Exhibit No. 3A was marked.)
25    Q. (By Mr. Sutherland) So you knew from your familiarity with

Page 127

1    the Wilder policy that they were carrying the buyer, had
2    insurance with the following features at least, and I'm not
3    going to be complete in the recitation, but that Wilder had
4    "commercial general liability insurance with limits of at
5    least $2,000,000"?
6    A. Correct.
7    Q. "Combined single limit per occurrence."
8            And they had automobile bodily injury and property
9    damage liability with those same minimum, two million
10    dollars?
11    A. Correct.
12    Q. You knew that the insurance had primary coverage.
13            It was primary coverage?
14    A. Correct.
15    Q. And we've seen a form that's attached to one of these
16    exhibits, it's a waiver of subrogation against Tesoro?
17    A. Correct.
18    Q. And by the virtue of the blanket endorsement it names
19    Tesoro as an additional insured?
20    A. Correct.
21    Q. Okay. By means of furnishing to Wilder a certificate of
22    insurance to all that effect that we've testified to all
23    morning, as far as you were concerned you were putting
24    Wilder in a position to be able to furnish a certificate of
25    insurance to Tesoro prior to entering Tesoro's premises?

Page 128

1    A. Correct.
2    Q. Now, this is a pretty big account, obviously.
3            In your experience, from time to time would a small
4    business entity, perhaps on a one-time basis, and I want
5    you to keep in mind this time frame with some kind of a St.
6    Paul policy, if an entity was asked to name a contracting
7    party as an additional insured -- do you have that kind of
8    a hypothetical? -- your client who is insured under a St.
9    Paul policy that didn't have a blanket form like this one,
10    does there come a time in midterm, to use the discussion
11    that you and Mr. Clarkson had, where they are telling you
12    "There's this contract and I have to add company-wise an
13    additional insured." Does that happen from time to time?
14    A. Depending on the carrier. I don't think I've ever had that
15    situation with St. Paul because St. Paul was one of the
16    first carriers to introduce the blanket form covering all
17    and offering up one single form to pick up all possible
18    scenarios.
19    Q. Okay. So, to your experience, we wouldn't find a G0322
20    form that had the name of a person or organization rather
21    than this blanket language?
22    A. Not that I'm aware of, no.
23    Q. All right. And it is your testimony that Parker, Smith &
24    Feek doesn't create this endorsement with the typewritten
25    language?

Page 129

1    A. The language comes from the underwriter. It's possible
2    that in the beginning, when you have a brand new policy
3    that hasn't yet been issued, that the underwriter may
4    either send you a photocopy of that form with the language
5    typed in or in some cases they will send you just the
6    language to be typed in within the agency and utilized for
7    issuance of certificates. Because certificates have to be
8    issued at the time of renewal, way prior to issuance of the
9    actual policy contract in those cases.
10    Q. Okay. So, in other words, there's an effective date and a
11    processing date, and sometimes the processing doesn't take
12    place for a while?
13    A. Right, yes, right.
14    Q. Now Exhibit 4 is a front page with another original note?
15    A. Yes.
16    Q. And I didn't get if Mr. Clarkson asked in whose hand you
17    thought that was written?
18    A. The sticky note on Exhibit 4 is in the handwriting of
19    Linda Lira.
20    Q. All right. Is it black and red?
21    A. Both black and red is her handwriting.
22            MR. SUTHERLAND: And I would ask
23            like the previous one, we make that
24            Exhibit 4A and color copy it.
25

33 (Pages 126 to 129)

30 (B) (6) DEPOSITION OF SHELLEY CARDIEL, 7/31/06

Page 142

1    And St. Paul has responded and pointed out that you
2    don't need to purchase some of these additional coverages
3    because it already exists in their own form?
4  A. Correct, that's -- they're responding to the request for
5    those coverages.
6  Q. Physically creating this policy to transmit to Wilder, is
7    that something that is done by Parker, Smith & Feek or is
8    it done by St. Paul and then transmitted to Parker, Smith &
9    Feek, the actual physical forms?
10  A. Policy issuance, including all the forms and endorsements,
11    is undertaken by the carrier and then the carrier provides
12    usually at least two copies, an insured's original and an
13    agent's copy.
14  Q. Vickie Hanekow, I think you stated she isn't with St. Paul
15    anymore?
16  A. That's correct.
17  Q. Was she also from the Walnut Creek area?
18  A. No, she was local; she was in the Seattle construction unit
19    for St. Paul.
20  Q. Okay. You testified at some length about the exchange of
21    E-mails with Michael Boele
22      Had you dealt with Mr. Boele on occasions previous to
23    this claim arising?
24  A. Yes.
25  Q. Was he the underwriter with whom you dealt when the policy

Page 143

1    was renewed in April '05?
2  A. I think we dealt with him for two or three years on the
3    renewals.
4  Q. All right. You've identified kind of a change in
5    philosophy or character between the St. Paul days and what
6    you're calling the Travelers days.
7      Is Mr. Boele a St. Paul person or is he somebody that
8    came over from Travelers?
9  A. He's a Travelers' person.
10  Q. So all the underwriting he did would have been at the time
11    the shift was from the St. Paul form to an ISO based form;
12    is that right?
13  A. He was the underwriter during that time frame, yes.
14  Q. So he wouldn't have underwritten the St. Paul form
15    policies?
16  A. No, no, not except under a liberalization clause during the
17    time when it was switching over, we were under
18    liberalization.
19  Q. Can you explain what that means?
20  A. That means that there was a period of time where the St.
21    Paul Travelers company agreed to provide their clients with
22    the most liberalized coverage during the switch because in
23    the switch from St. Paul to Travelers, the Travelers forms
24    were not as broad.
25      So for a period of time, approximately sixteen to

Page 144

1    eighteen months, they offered their clients the more
2    liberal of the two forms during that period of time in an
3    attempt to keep clients to stay during that time period.
4  Q. When was that? For purposes here, can you tell from
5    looking at this? We've seen the one file that --
6  A. Yeah, it was a clear switch that year, this '05-'06 was the
7    first year that we were in a clear switch to the ISO. So
8    it would have been like the eighteen months before that, it
9    would have been '04-'05.
10  Q. And how was that liberalization policy implemented? Did
11    the client choose, "I want a St. Paul form" or --
12  A. There was a --
13  Q. -- are there two forms presented and then we'll see which
14    one has more coverage when the time comes?
15  A. No, no, that's not how it works. The clients were all sent
16    a letter directly by the carrier advising them of the
17    liberalization policy and procedure. And then I think
18    the -- I think the only time you trigger a liberalization
19    is in the case of a claim. But I've never been involved in
20    a liberalization trigger personally so I can't speak to
21    exactly how it works.
22  Q. Whatever the time frame may have been for this
23    liberalization, is it fair to say this policy doesn't fall
24    under it?
25  A. Which one?

Page 145

1  Q. The policy that we're here for, the one that may or may not
2    provide coverage to Tesoro for this death.
3  A. The policy that was in effect at the time the accident
4    occurred?
5  Q. Correct.
6  A. I'm not sure if it applies during that period or not or if
7    that was purely St. Paul --
8  Q. You just don't know?
9  A. -- forms and endorsements, I'm not sure that it was that
10    early.
11  Q. Okay. Directing your attention to Mr. Boele's response to
12    you and Linda Lira on March 10, at the top of this Exhibit
13    No. 11.
14  A. Okay.
15  Q. I'll just have you read that.
16  A. (The witness complies.)
17  Q. Is it part of your company's service to their clients to
18    recommend transfer of risk provisions and the like that Mr.
19    Boele is suggesting should have been in place in this
20    circumstance that's described in his message on Exhibit 11?
21      MS. KILLIAN: Can you read that
22    question back to me.
23
24      (The court reporter reads back.)
25

37 (Pages 142 to 145)