## Tesoro Asphalt Sales Contract

Tesoro Refining and Marketing Company
10200 West March Point Road
Anacortes, Washington 98221

(Referred to herein as "Seller")

SOLD TO:

Wilder Construction Company
dba Central Paving Products
11301 Lang Street
Anchorage, AK 99515-3006

(Referred to herein as "Buyer")

SHIP TO:

Alaska

PROJECT:

2004 Lump Sum Asphalt Sales

IMPORTANT
Please remit Payment to:

Tesoro Alaska Company
P. O. Box 93373
Chicago, Illinois 60673-3373

| CONTRACT NO.: | 40008078 |
|---|---|

| CONTRACT DATE: | JUNE 29, 2004 |
|---|---|

| Contract Term | July 1, 2004 – December 31, 2004 |
|---|---|
| Ship Via | Truck |
| Terms | 1.5% 10 days, Net 30, Payment by EFT |
| F.O.B. | Nikiski Refinery |

| QUANTITY | DESCRIPTION/SPECIFICATION | PRICE |
|---|---|---|
| ± 4,000 tons | PG 52-28 Asphalt | $180.00/ton |
| | Anti-Strip | $4.50/ton |
| | All prices are FOB Nikiski rack. | |
| | Products meet Alaska DOT specifications. | |

CONDITIONS OF SALE:
The general terms and conditions on the reverse hereof are incorporated in this contract and constitute a part hereof. Buyer by execution of this contract agrees to the general terms and conditions.

AGREED TO AND ACCEPTANCE ON THIS THE __7Th__ DAY OF __July__ 2004

| BUYER | SELLER |
|---|---|
| Wilder Construction Co. dba Central Paving Products | Tesoro Refining and Marketing Company |
| BY *Jim Winchester* (signature) | BY *Randy Christian* /sy (signature) |
| NAME & TITLE | NAME & TITLE |
| Jim Winchester | Randy Christian |
| Sales and Marketing Manager | Manager, Commercial Marketing, Asphalt |

## TESORO ASPHALT SALES CONTRACT
## GENERAL TERMS AND CONDITIONS

Seller agrees to sell, and Buyer agrees to purchase, receive and pay for Asphalt in accordance with the provisions of the Asphalt Sales Contract ("Agreement") and these General Terms and Conditions.

1. **PRODUCT:** The Product shall be Asphalt meeting the specification (the "Specification") set forth in the Agreement. Seller and Buyer may mutually agree to change the Specification. Testing of the Product shall be conducted by Seller's laboratory from a representative sample of Seller's shipping tank which tank is sampled on not less than a weekly basis when shipments are made. The samples will be retained for 60 days, and the test results will be conclusive and binding unless Buyer requests testing of the retain sample by an independent laboratory within the 60 day retain period. The independent laboratory selected by Buyer must be approved by Seller, which approval shall not be unreasonably withheld. Costs of such independent tests will be at the sole expense of Buyer unless the results of such independent tests indicate non-conforming Product in which case the costs shall be shared equally by the parties. Buyer acknowledges that Seller does not sample each delivery load but samples Seller's shipping tank. Seller's warranty that Product is on specification shall be determined based upon Seller's sample of the shipping tank closest in time before or during delivery to Buyer.

2. **QUANTITY:** The quantity of Product sold and purchased under this Agreement shall be as stated in the Agreement.

3. **TERM:** Unless earlier terminated for default or as otherwise provided in the Agreement or these General Terms and Conditions, the term of the Agreement shall be the term set forth in the Agreement.

4. **DELIVERIES, TITLE AND RISK OF LOSS:**

   a. Buyer shall give Seller reasonable advance written notice of desired deliveries and their quantities.

   b. For sales made at Seller's facility and not delivered to Buyer by Seller, ownership, title and risk of loss shall pass from Seller to Buyer at the point and time that Seller loads the Product into Buyer's truck or Buyer's representative's truck or into railroad tank cars owned, leased or controlled by Buyer. For sales made on a delivered basis to Buyer's plant or destination, ownership, title and risk of loss shall pass from Seller to Buyer at the point of discharge at Buyer's plant or destination. Loading of Product under this Agreement shall take place at Seller's or Seller's representative's facility located as set forth in the Agreement. Any usage of terms such as FCA, FOB, C&F, CPT, CIF, and ex dock in connection with specific orders are used solely to denote price and service provisions.

   c. Seller shall prepare and be responsible for all bills of lading, certification and associated formalities relating to the shipments of Product.

   d. All quantities will be determined by certified scale weighmaster's certificate issued at or near Seller's supply location, or closest equivalent. The parties will periodically review differences, if any, between Seller's invoiced weights and Buyer's weights and Buyer agrees to call any significant differences to Seller's attention promptly. Any significant differences will be resolved by the parties. Any objection as to quantity must be made within thirty (30) days of Buyer's receipt of Seller's invoice and if not made within such time, the quantity shall be conclusively established as the quantity shown on Seller's invoice.

5. **PRICE:** The Base Price for Product shall be the price per short ton consisting of 2,000 pounds as set forth in the Agreement. The total price for each Product shall be the Base Price plus all taxes, fees or similar charges specified in Section 7 of this Agreement. Buyer agrees to pay all such fees, taxes and charges in addition to the Base price for all Product purchased under this Agreement provided, however, the party with title to the Product at the time of assessment shall pay any personal property taxes on the Product.

6. **PAYMENT AND REMEDIES:** Seller shall invoice Buyer following each loading. Buyer agrees to pay all amounts due Seller under this Agreement net thirty (30) days as specified on the invoice. Any payment made beyond the due date specified on the invoice may be charged a daily late payment at the rate of 0.049315%, provided that in no event shall the maximum rate allowed by applicable law be exceeded. In the event Buyer shall fail to make any payment hereunder when due or shall fail to observe or perform any of the terms and conditions of this Agreement, Seller may, at Seller's option, withhold deliveries, require all future deliveries to be prepaid, terminate this Agreement, or exercise any one or all of the remedies provided for in the Agreement without prejudice to any other remedy or right of action which Seller may have by law. Either party may immediately terminate this Agreement if the other party becomes involved in bankruptcy or insolvency proceedings. The prevailing party shall be entitled to recover its attorneys' fees and costs in enforcing this Agreement.

Seller may change Buyer's credit limit at any time without notice, in Seller's sole discretion, including without limitation requiring all future deliveries to be prepaid, and may request periodic financial information to determine such changes. Seller may alter payment terms (other than credit limit) at any time by giving five (5) days' prior notice to Buyer and Buyer agrees to comply with such altered terms.

7. **TAXES AND OTHER CHARGES:** Buyer shall pay to Seller any and all federal, state and local taxes (other than taxes based on or measured by Seller's net income) including but not limited to, sales, use, value added, occupation, excise, gross receipts, ad valorem, environmental and any other taxes, tariffs, duties, fees, assessment or charges of whatever nature, imposed directly or indirectly, now or hereafter, by any government instrumentality or subdivision thereof, or by law, rule or regulation on the Product or the sale, purchase, manufacture, distribution, use or delivery thereof under this Agreement, or proportionally on the feedstock from which the Product are derived. Where excise taxes are levied, Buyer shall also pay an amount which when added to the payments hereunder shall yield to Seller after deduction of all excise taxes a net amount equal to that which Seller would have realized from such payments if no such taxes had been imposed. If Buyer claims an exemption from taxes, Buyer must provide a tax exemption certificate to Seller.

8. **NONEXCLUSIVE:** This is a nonexclusive supply agreement with no contractual restriction on Seller's ability to sell Product to any third party in any manner. Notwithstanding any other provision under this Agreement, Seller reserves a discretionary right to sell its Product anywhere, by any means it elects.

9. **LIABILITY AND INDEMNITY:**

   a. The Product may be or become hazardous. As used in this Section 9, "Product" also includes any impurity, derivative product, by-product or waste product. Buyer acknowledges that it is familiar with, and undertakes to take all reasonable steps to inform and familiarize all its employees, agents, and contractors who may handle the Product of all hazards pertaining to (i) the Product in whatever form, (ii) all uses and applications of the Product, (iii) the containers in which the Product may be shipped or stored, and procedures for their safe use, and (iv) equipment with which it is used and handled. Buyer also undertakes to familiarize itself with all federal, state, or local laws and regulations relating to the handling, storage, distribution and disposal of the Product, to label the Product and all applicable containers and equipment, as appropriate, to give due warning and protection to its employees and others from such hazards; and to inform, protect and train its agents and employees (and to urge its contractors and customers to inform, protect and train their agents and employees) in the safe and proper uses, handling and labeling of the Product, containers and equipment. Seller's Material Safety Data Sheet is attached and Buyer acknowledges.

   b. Buyer assumes full responsibility for and liability arising out of shipment, unloading, discharge, storage, handling, use and disposal of such Product, co-product, derivative product, by-product, waste product or container for the Product, including the use of such Product or container alone or in combination with other substances and the compliance or non-compliance with any laws or regulations.

   c. Buyer shall indemnify, defend and hold harmless Seller, its parent and affiliates and their shareholders, officers, directors, employees, representatives and agents and all of them, from and against any and all damages, costs, losses, claims, fines, charges, penalties, judgments, liens, expenses (including attorneys' fees and other defense costs), demands, liabilities and causes of action of every kind and character, including without limitation, those for damage to property (including Buyer's or Seller's property) or injury to or death of any person (including Buyer's or Seller's employees), in any way incident to, in connection with, or arising directly or indirectly out of Buyer's or its employee's, contractor's or agent's actions or omissions in or during the operation or conduct of Buyer's business, the receipt, storage, transportation and use of the Product, and the disclosure or warning of risks associated with the Product, without regard to the cause or causes thereof or the negligence of any party or parties, except to the extent caused by the sole negligence or

willful misconduct of Seller. Seller shall have the right, at its own expense, to participate in the defense of each matter defended by Buyer in accordance with this provision. Each party shall promptly notify the other of any claim, demand or suit that may be presented or served upon it by any person or entity arising out of the transactions covered by this Agreement.

   d. Without limiting or detracting from the indemnity provisions above or elsewhere in this Agreement, Buyer shall comply with all Federal, State and local laws and ordinances relating to the environment and the operation or conduct of Buyer's business, and with all the rules, orders and regulations issued and promulgated thereunder, and shall procure and maintain all permits and licenses required thereunder, and shall defend, indemnify and hold harmless Seller from and against any and all losses, penalties, interests, costs, expenses, claims, judgments and orders with respect to such laws, ordinances, rules, orders and regulations, except to the extent of the sole negligence or willful misconduct of Seller.

   e. If deliveries are made into vehicles or railroad tank cars supplied by Buyer or Buyer's representative at Seller's facilities, Seller shall not be required to make such deliveries unless such vehicles are clean for acceptance of Product and empty and in full compliance with all applicable legal requirements, including any required license, certificate or registration. Furthermore, Buyer and Buyer's employees and agents shall strictly comply with all rules and regulations that Seller may establish from time to time regarding the conduct of third parties on Seller's premises. Seller shall have the right to terminate this Agreement or prohibit any employee, representative, contractor or agent of Buyer from entering Seller's premises for any non-compliance of Seller's rules and regulations. Buyer shall provide or cause Buyer's representatives to provide, a list of all trucks including truck number, license, make, model, make, and tank size and shall provide such information as required by Seller for railroad tank cars. Buyer will provide copy of license for all drivers.

   f. Buyer or Buyer's representative shall carry the following insurance as a condition to entry onto Seller's premises: (1) Worker's Compensation Insurance and Employer's Liability Insurance to cover statutory limits of the Worker's Compensation Laws of the state where delivery takes place; (2) Commercial General Liability Insurance with minimum limits of $2,000,000 combined single limit per occurrence for bodily injury and property damage liability; and (3) Automobile bodily injury and property damage liability insurance with minimum limits of $2,000,000 combined single limit per occurrence, covering all owned and non-owned, hired vehicles. Such insurance shall be primary coverage, shall include a waiver of subrogation against Seller and shall name Seller as an additional insured. Buyer or Buyer's representative shall furnish a certificate of insurance to Seller prior to entering Seller's premises, which certificate shall contain a provision stating the issuing company will endeavor to give Seller ten (10) days prior written notice in event of cancellation or material change in the insurance.

10. **FORCE MAJEURE:** As used in this Agreement, an event or act of "Force Majeure" is defined as follows: acts of God, the public enemy, wars, riots, strikes, labor disputes, boycotts, blockades, insurrections, inability to secure materials or labor, unavailability of shipping at reasonable cost, epidemics, landslides, lightning, earthquakes, fires, tsunamis, floods, tidal waves, volcanic eruptions, explosions, natural catastrophe, failure of equipment or machinery or pipelines, unavailability of useable or suitable crude oil or Product at reasonable cost, suspension of crude oil or Product supplies, failure of normal sources of supply of labor, materials, transportation, energy or utilities, failure to obtain permit or any other cause not reasonably within the control of the affected party which materially affects that party's ability to fulfill any provisions of this Agreement. Buyer or Seller, as the case may be, shall be excused from its performance hereunder for any period an event or act of Force Majeure exists as to such party, provided such party promptly notifies the other of such event or act and use due diligence to cure such event or act. In no event, however, shall Buyer be excused from its obligation to make payments due for Product delivered prior to the act or event of Force Majeure. All obligations hereunder shall be resumed upon cure of the event or act of Force Majeure, but neither party shall be obligated to make up deliveries or purchases missed during the period of Force Majeure. If, during or following an event of Force Majeure, supply of Product is available to make up delivery, Seller shall, after satisfying its needs and those of its affiliates, allocate remaining supplies in a fair and equitable manner which assures that Buyer will receive a proportionate allocation of available supply based on Buyer's prior level of Product purchased. Seller shall not be required to purchase Product from third parties or to take Product from any producing locations other than the one designated in this Agreement.

11. **REGULATIONS:** Buyer shall comply with all applicable current and future laws, regulations, rules and orders, pertaining to its operations and performance under this Agreement, and Buyer's indemnity obligation under section 9 shall include any failure to do so. If Buyer fails to comply with any such laws, regulations, rules or orders, Seller shall have the right to suspend deliveries or terminate this Agreement entirely, in addition to all other remedies that Seller may have.

12. **NOTICES:** Any notice shall be in writing unless specified otherwise and shall be deemed to have been duly given when sent to the other party at the address listed on the signature page. Notices shall be by facsimile, cable, telegram, telex, or first class or express mail, postage prepaid. The parties may substitute other addresses upon the giving of proper notice from time to time in the manner provided above.

13. **ASSIGNMENT:** Buyer shall not assign, transfer, mortgage, pledge, hypothecate or encumber this Agreement or any interest therein without the prior written consent of Seller and any such purported transfer without consent shall be void and shall at the option of Seller constitute a default of this Agreement.

14. **APPLICABLE LAW:** This Agreement will be construed and enforced in accordance with the laws of the state where Seller loads the Product for shipment to Buyer without regard to conflict of law rules.

15. **LIMITATION OF DAMAGES:** Seller's total aggregate liability related directly or indirectly to this Agreement and the Product shall not exceed the value of this Agreement for any claim of any nature, whether based in or arising under warranty, tort (including negligence or strict liability) or otherwise. In no event shall Seller be liable to Buyer for any special, indirect, incidental or consequential damages of any kind whether based in contract, tort (including negligence or strict liability), warranty or otherwise.

16. **WARRANTIES DISCLAIMER:** Seller warrants that it has title to the Product sold under this Agreement and that the Product, at the time ownership passes to Buyer, shall meet the Specification. THERE ARE NO GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR SUITABILITY OF THE PRODUCT FOR ANY PARTICULAR PURPOSE, OR OTHERWISE, WHICH EXTEND BEYOND THE DESCRIPTION OF THE PRODUCT AND THE SPECIFICATION.

Should the Product upon testing fail to conform to the Specification, either party having knowledge of such nonconforming Product shall promptly notify the other party of any such failure. Buyer shall, at its election, either reject any Product not meeting the Specification or accept such deliveries of nonconforming Product. Should Buyer reject such nonconforming Product, Seller may, at its election, either refund the purchase price (if received) of the nonconforming Product or replace it with comparable quantities of Product. Should Buyer after knowledge of such nonconforming Product accept such nonconforming Product, the accepted quantity shall be deemed tonnage delivered in accordance with this Agreement, and the Buyer assumes all risk and liability for the use of such nonconforming Product. This right to accept or reject nonconforming Product shall constitute Buyer's sole and exclusive remedy with respect to delivery of nonconforming Product and Seller's sole and exclusive obligation and liability in such event, where such Product is determined by testing to be nonconforming. The testing of the retained samples as set forth herein shall be determinative of the issue of specification of the Product.

17. **ENTIRE AGREEMENT, WAIVER AND ILLEGALITY:** This writing (together with the Agreement and any attachments) incorporates the entire agreement between the parties with reference to the subject matter and cancels and supersedes all prior oral and written understandings or agreements with respect to the subject matter. This Agreement including the General Terms and Conditions may be amended or modified only by written instrument executed by both parties. Failure to insist upon strict performance of any provision shall not constitute a waiver of the right to require such performance, nor shall a waiver in one case constitute a waiver with respect to a later breach; and acceptance of performance with knowledge of any breach or default shall not constitute a waiver. If any term or provision of this Agreement or the General Terms and Conditions is held to be illegal or unenforceable, the remaining terms and provisions shall not be affected. The heading of any provision is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or the General Terms and Conditions. The Agreement and the General Terms and Conditions constitute one contract. In the event that any provision of the General Terms and Conditions is in conflict with the Agreement, the provisions of the Agreement shall control.

TSO Asphalt Contract 7/5/00
This document contains confidential information. Disclosure, copying, or distribution to others of the information contained herein is prohibited without the express permission from Tesoro.

1