Page 1

1　　　　　IN THE UNITED STATES DISTRICT COURT

2　　　　　　　FOR THE DISTRICT OF ALASKA

3　_____

4　TESORO ALASKA COMPANY,　　　　　)
　　　　　　　　　　　　　　　　　　)
5　　　　　　　　Plaintiff,　　　　 )
　　　　　　　　　　　　　　　　　　)
6　　　　v.　　　　　　　　　　　　 )　No. 3:06-CV-00020-TMB
　　　　　　　　　　　　　　　　　　)
7　ST. PAUL FIRE AND MARINE　　　　)
　　INSURANCE COMPANY,　　　　　　 )
8　　　　　　　　　　　　　　　　　 )
　　　　　　　　Defendant.　　　　　)
9　_____

10

11　　　　DEPOSITION UPON ORAL EXAMINATION

12　　　　　　　　　　　　OF

13　　　　　　　　　MICHAEL FALLON

14　_____

15

16　　　　　　　　August 1st, 2006

17　　　　　　　　　 9:40 a.m.

18　　　　　 601 Union Street, Suite 3100

19　　　　　　　 Seattle, Washington

20

21

22

23

24　　　　　　　　AMINAH R. CHAMBERS

25　　　　 REGISTERED PROFESSIONAL REPORTER

Page 9

```
 1    Q    (By Mr. Clarkson)  Okay.  We'll talk about some
 2         of those in more detail as we go along.  Why
 3         don't we start out first by just doing this:
 4         Tell me what your position is with Wilder.
 5    A    The title position is safety and risk manager.
 6    Q    What do you do as safety and risk manager?
 7    A    Lots of people ask that question; sometimes I
 8         struggle to answer.  On the safety side, it's
 9         geared toward overseeing a program aimed at
10         preventing injury to employees and members of the
11         public and complying with regulatory
12         requirements.  On the risk management side, it's
13         probably geared towards getting value for the
14         dollar we expend for insurance coverages,
15         maintaining relationships with those insurers,
16         making sure things work smoothly, and that the
17         interests of the company are adequately
18         represented.
19    Q    What specific duties do you have with the
20         acquisition of insurance for Wilder?
21    A    I guess every year at renewal time we figure out
22         whether or not we're going to shop for insurance
23         and look for other providers.  There have been
24         years where we have elected not to.  The last
25         three years we have.
```

Page 15

```
 1         responsible for those contracts?
 2    A    They're the ones that have made the arrangements
 3         to purchase to oil from Tesoro.
 4              MR. SUTHERLAND:  This doesn't
 5           need to be on the record.
 6
 7         (A discussion was held off the record.)
 8
 9    Q    (By Mr. Clarkson)  I'm going to hand you one of
10         the folders you brought with you this morning.
11         Why don't you identify for the record what that
12         is.
13    A    It's entitled Tesoro Asphalt Sales Contracts, and
14         it's a compilation of various Tesoro asphalt
15         sales contracts.  The top one shows to be
16         June 14th, '05, and I think there's one going
17         back to even 2002 in here.
18    Q    Do you know when the first point at which it was
19         that Wilder purchased asphalt from Tesoro Alaska?
20    A    I don't.  That's been a subject of some
21         discussion internally, how long have we been
22         buying from Tesoro.  Estimates range from 10 to
23         15 years.
24    Q    And when those discussions have taken place, who
25         participated in those discussions?
```

Page 17

1       back to the 2002 period?
2   A   I thought I saw it, Dickhaus.  12th August, '02.
3   Q   Can I see that?  Why don't we mark that as
4       Exhibit 2.
5
6           (Exhibit No. 2 was marked.)
7
8   Q   (By Mr. Clarkson)  So Exhibit 2 is an asphalt
9       sales contract between Wilder and Tesoro Alaska
10      dated what?
11  A   Contract date August 8, 2002.
12  Q   And that contract was executed by who on behalf
13      of --
14  A   Dave Dickhaus, Alaska division manager.
15  Q   And by Tesoro?
16  A   Randy Christian.
17  Q   Now, did you have any involvement with the
18      insurance aspects of that contract?
19  A   Absolutely not.
20  Q   Did, to your knowledge, Wilder carry insurance
21      for additional protected persons such as Tesoro
22      who might require that additional protected
23      persons coverage by contract in 2002?
24  A   To my knowledge, yes.
25  Q   And you brought with you another file entitled

# Tesoro Asphalt Sales Contract

Tesoro Refining and Marketing Company
10200 West March Point Road
Anacortes, Washington 98221

(Referred to herein as "Seller")

**SOLD TO:**

Wilder Construction Company
Attn: Dave Dickhaus
11301 Lang Street
Anchorage, AK 99515-3006

(Referred to herein as "Buyer")

**SHIP TO:**

Alaska

**PROJECT:**

General use for 2002 asphalt season

IMPORTANT
Please remit Payment to:

Tesoro Alaska Company
P. O. Box 93373
Chicago, Illinois 60673-3373

| Contract No.: | 40004193 |
|---|---|
| Contract Date: | August 8, 2002 |

| Contract Term | |
|---|---|
| | 8/8/02 – 12/31/02 |
| Ship Via | |
| | Truck |
| Terms | |
| | Net 30 days |
| F.O.B. | |
| | Nikiski Refinery |

| QUANTITY | DESCRIPTION/SPECIFICATION | PRICE |
|---|---|---|
| 4,000 tons | PG 52-28 Asphalt | $140.00/ton |
| | Anti-Strip | $4.50/ton |
| | All prices are FOB Nikiski rack. Products meet Alaska DOT specifications. | |

2

CONDITIONS OF SALE:

The general terms and conditions on the reverse hereof are incorporated in this contract and constitute a part hereof. Buyer by execution of this contract agrees to the general terms and conditions.

| AGREED TO AND ACCEPTANCE ON THIS THE 12th DAY OF August 2002 ||
|---|---|
| **BUYER** | **SELLER** |
| Wilder Construction Company | Tesoro Refining and Marketing Company |
| BY [signature] | BY [signature] Randy Christian |
| **NAME & TITLE** | **NAME & TITLE** |
| Dave Dickhaus | Randy Christian |
| Alaska Division Manager | Manager, Commercial Marketing, Asphalt |

TESORO ASPHALT SALES CONTRACT
GENERAL TERMS AND CONDITIONS

Seller agrees to sell, and Buyer agrees to purchase, receive and pay for Asphalt in accordance with the provisions of the Asphalt Sales Contract (Agreement) and these General Terms and Conditions.

1. PRODUCT. The Product shall be Asphalt meeting the specifications (the "Specification") set forth in the Agreement. Seller and Buyer may mutually agree to change the Specification. Testing of the Product shall be conducted by Seller's laboratory from a representative sample of Seller's shipping tank, which tank is sampled on not less than a weekly basis when shipments are made. The samples will be retained for 60 days, and the test results will be conclusive and binding unless Buyer requests independent testing of the retain sample by an independent laboratory within 60 day retain period. The independent laboratory selected by Buyer must be approved by Seller, which approval shall not be unreasonably withheld. Costs of such independent tests will be to the sole expense of Buyer unless the results of such independent tests indicate non-conforming Product, in which case the costs shall be shared equally by the parties. Seller's warranty that Product is on specification shall be determined based upon Seller's sample of the shipping tank closest in time before or during delivery to Buyer.

2. QUANTITY. The quantity of Product sold and purchased under this Agreement shall be as stated in the Agreement.

3. TERM. Unless earlier terminated for default as otherwise provided in the Agreement or these General Terms and Conditions, the term of this Agreement shall be the term set forth in the Agreement.

4. DELIVERIES, TITLE AND RISK OF LOSS.

   a. Buyer shall give Seller reasonable advance written notice of desired deliveries and their quantities. Buyer shall order and take deliveries in approximately equal monthly quantities.

   b. For sales made at Seller's facility and not delivered to Buyer by Seller, ownership, title and risk of loss shall pass from Seller at the point and time that Seller loads the Product into Buyer's truck or Buyer's representative's truck or into railroad tank cars owned, leased or controlled by Buyer. For sales made on a delivered basis to Buyer's plant or destination, ownership, title and risk of loss shall pass from Seller to Buyer at the point of discharge at Buyer's plant or destination. Loading of Product under this Agreement shall take place at Seller's or Seller's representative's facility located as set forth in the Agreement. Any usage of terms such as FCA, FOB, C&F, CPT, CIF, and ex dock in connection with specific orders are used solely to denote price and service provisions.

   c. Seller shall prepare and be responsible for all bills of lading, certifications and associated formalities relating to the shipments of Product.

   d. All quantities will be determined by certified scale weighmaster's certificate issued at or near Seller's supply location, or closest equivalent. The parties will periodically review differences, if any, between Seller's invoiced weights and Buyer's weights and Buyer agrees to call any significant differences to Seller's attention. Any significant differences will be resolved by the parties. Any objection as to quantity must be made within thirty (30) days of Buyer's receipt of Seller's invoice and if not made within such time, the quantity shall be conclusively established as the quantity shown on Seller's invoice.

5. PRICE. The Base Price for Product shall be the price per short ton consisting of 2,000 pounds as set forth in the Agreement. The total price for each Product shall be the Base Price plus all taxes, fees or similar charges specified in Section 7 of this Agreement. Buyer agrees to pay all such fees, taxes and charges in addition to the Base Price for all Product purchased under this Agreement, however, the party who has title to the Product at the time of assessment shall pay any personal property taxes.

6. PAYMENT AND REMEDIES. Seller shall invoice Buyer following each loading. Buyer agrees to pay all amounts due Seller under this Agreement net thirty (30) days as specified on the invoice. Any payment made beyond the due date for payment of the invoice may be charged a daily late payment at the rate of 0.0483157%, provided that in no event shall the maximum rate allowed by applicable law be exceeded. In the event Buyer shall fail to make any payment hereunder when due or shall fail to observe any of the terms and conditions of this Agreement, Seller may, at Seller's option, decline or refuse to perform any of the terms and conditions of this Agreement, or exercise any or all of its remedies provided in this Agreement without prejudice to any other remedy or right of action which Seller may have by law. Either party may immediately terminate this Agreement if the other party becomes involved in bankruptcy or insolvency proceedings. The prevailing party shall be entitled to recover its attorneys' fees and costs in enforcing this Agreement.

7. TAXES AND OTHER CHARGES. Buyer shall pay to Seller any and all federal, state and local taxes (other than taxes based on or measured by Seller's net income) including, but not limited to, sales, use, value added, consumption, excise, gross receipts, ad valorem, environmental and any other taxes, tariffs, dues, fees, assessment or charges of whatever nature, imposed directly or indirectly, by any governmental instrumentality or subdivision thereof, by law, rule or regulation on the feedstock from which the Product is made, purchase, manufacture, distribution, use or delivery hereunder of the Product. Where excise taxes are levied, Buyer shall pay any amount which when added to the payments hereunder shall yield to Seller after deduction of all excise taxes a net amount equal to that which Seller would have realized from such payments if no such taxes had been imposed. If Buyer claims an exemption from taxes, Buyer must provide a tax exemption certificate to Seller.

8. NONEXCLUSIVE. This is a nonexclusive supply agreement with no contractual restriction on Seller's ability to sell Product or to any third party in any manner. Notwithstanding any other provision under this Agreement, Seller reserves a discretionary right to sell its Product anywhere, by any means it elects.

9. LIABILITY AND INDEMNITY.

   a. The Product may be or become hazardous. As used in this Section 9, "Product" also includes any impurity, derivative product, by-product, or waste product. Buyer acknowledges that it is familiar with, and undertakes to take all reasonable steps to inform and familiarize all its employees, agents, and contractors who may handle the Product of all hazards pertaining to (i) the Product in whatever form, (ii) all uses and applications of the Product, (iii) the containers in which the Product may be shipped or stored, and procedures for safe use, and (iv) all governmental laws, rules and regulations relating to the handling, storage, distribution and disposal of the Product. Buyer also undertakes to familiarize itself with all federal, state, or local laws and regulations relating to the handling, storage, distribution and disposal of the Product and to label the Product and all applicable containers as appropriate, to give adequate warning and protection to its employees and others from such hazards; and to inform, protect and train its agents and employees (and to urge its contractors and customers to inform, protect and train their agents and employees) in the safe and proper uses, handling and labeling of the Product, containers and equipment. Seller's Material Safety Data Sheet is attached and Buyer acknowledges.

   b. Buyer assumes full responsibility for and liability arising out of shipment, unloading, discharge, storage, handling, use and disposal of any Product, co-product, derivative product, by-product, waste product, or container for the Product, including the use of such Product or container alone or in combination with other substances and the occurrence of non-compliance with any laws or regulations.

   c. Buyer shall indemnify, defend and hold harmless Seller, its parent and affiliates and their shareholders, officers, directors, employees, representatives and agents and all of them, from and against any and all damages, costs, losses, claims, charges, penalties, judgments, liens, expenses (including attorneys' fees and other defense costs), and liabilities or any kind and character, demands, liabilities or causes of action of every kind and character, arising without limitation, those for damage to property (including Buyer's or Seller's property) or injury to or death of any person (including Buyer's or Seller's employees), in any way incident to, in connection with, or arising directly or indirectly out of the operation or conduct of Buyer's business, the receipt, storage, transportation and use of the Product, and the disclosure or warning of risks associated with the Product, without regard to the cause or causes thereof.

10. FORCE MAJEURE. As used in this Agreement, an event or act of "Force Majeure" is defined as follows: acts of God and the public enemy, wars, riots, strikes, labor disputes, lockouts, blockades, insurrections, inability to secure materials or labor, unavailability of shipping at reasonable cost, epidemics, lightning, earthquakes, fires, tsunamis, floods, tidal waves, volcanic eruptions, explosions, natural catastrophes, failure of equipment or machinery or pipelines, unavailability of useable or suitable crude oil or Product at reasonable cost, suspension of crude oil or Product supplies, failure of normal sources of supply of labor, materials, transportation, energy or utilities, failure to obtain permits or any other cause not reasonably within the control of the affected party which materially affects that party's ability to fulfill any provisions of this Agreement. Buyer or Seller, as the case may be, shall be excused from its performance hereunder for any period use due diligence to cure such event or act. In no event, however, shall Buyer be excused from its obligation to make payments due for Product delivered prior to the event of Force Majeure. All obligations hereunder shall be resumed upon cure of the event or act of Force Majeure, but neither party shall be obligated to make up deliveries or purchases missed during the period of Force Majeure. If, during or following an event of Force Majeure, supply of Product is available to make up delivery, Seller shall, after satisfying its needs and those of its affiliates, allocate remaining supplies in a fair and equitable manner which assures that Buyer will receive a proportionate allocation of available supply based on Buyer's prior level of Product purchased. Seller shall not be required to purchase Product from third parties or to take Product from any producing locations other than the one designated in this Agreement.

11. REGULATIONS. Buyer shall comply with all applicable current and future laws, regulations, rules and orders pertaining to its operations and performance under this Agreement, and Buyer's indemnity obligation under Section 9 include any failure to do so. If Buyer fails to comply with any such laws, regulations, rules or orders, Seller shall have a right to suspend deliveries of the Agreement entirely, in addition to its legal remedies, that Seller may have.

12. NOTICES. Any notice shall be in writing unless specified otherwise and shall be deemed to have been duly given when sent to the other party at the address listed on the signature page. Notices shall be by facsimile, cable, telegram, telex, or first class or express mail, postage prepaid. The parties may substitute other addresses upon the giving of proper notice from time to time in the manner provided above.

13. ASSIGNMENT. Buyer shall not assign, transfer, mortgage, pledge, hypothecate or encumber this Agreement or any interest thereon without the prior written consent of Seller and any such purported transfer without consent shall be void and shall at the option of Seller constitute a default of this Agreement.

14. APPLICABLE LAW. This Agreement will be construed and enforced in accordance with the laws of the state where Seller loads the Product for shipment without regard to conflict of law rules.

15. LIMITATION OF DAMAGES. Seller's total aggregate liability related directly or indirectly to this Agreement and the Product shall not exceed the value of this Agreement. In no event shall Seller be liable for any indirect, incidental or consequential damages of any kind whether based in contract, tort (including negligence or strict liability), warranty or otherwise.

16. WARRANTIES DISCLAIMER. Seller warrants that it has title to the Product sold under this Agreement and that the Product, at the time ownership passes to Buyer, shall meet the Specification. THERE ARE NO GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR SUITABILITY OF THE PRODUCT FOR ANY PARTICULAR PURPOSE, OR OTHERWISE, WHICH EXTEND BEYOND THE DESCRIPTION OF THE PRODUCT AND THE SPECIFICATION. Should the Product upon testing fail to conform to the Specification, either party having knowledge of such nonconforming Product shall promptly notify the other party of any such failure. Buyer shall, at its election, either reject such Product as not meeting the Specification or accept such delivered Product. Should Buyer reject such nonconforming Product or replace it with comparable quantities of Product, either refund the purchase price (if received) of the nonconforming Product, or replace it with comparable quantities of Product. Should Buyer accept such nonconforming Product, the accepted quantity shall be deemed damaged in accordance with this Agreement, and the Buyer assumes the risk and liability for knowledge of such nonconforming Product. This right to accept or reject nonconforming Product shall constitute Buyer's sole and exclusive remedy with respect to delivery of nonconforming Product and Seller's sole and exclusive obligation and liability in such event, where such Product is determined by testing to be nonconforming. The testing of the retained samples as set forth herein shall be determinative of the issue of specification of the Product.

17. ENTIRE AGREEMENT, WAIVER AND LEGALITY. This writing (together with the Agreement and any attachments) incorporates the entire agreement between the parties with reference to the subject matter and supersedes all prior oral and written understandings or agreements with respect to the subject matter. This Agreement including the General Terms and Conditions may be amended or modified only by written instrument executed by both parties. Failure to insist upon strict performance of any provision shall not constitute a waiver of the right to require such performance with knowledge of any breach of default shall not constitute a waiver of a later breach and acceptance of performance with knowledge of any breach or default shall not be held to be legal or unenforceable, the remaining terms and provisions of the General Terms and Conditions for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement or Conditions. The Agreement and the General Terms and Conditions constitute one contract. In the event that any provision of the General Terms and Conditions is in conflict with this Agreement, the provisions of the Agreement shall control.

TSO Asphalt Contract 7/5/00
This document contains confidential information. Disclosure, copying, or distribution to others of the information contained herein is prohibited without the express permission from Tesoro.