Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ALASKA

 3

 4   ------------------------------------------------------

 5   TESORO ALASKA COMPANY,    )
                               )
 6              Plaintiff,     )  No. 3:06-CV-00020-TMB
                               )
 7       v.                    )
     ST. PAUL FIRE AND MARINE  )
 8   INSURANCE COMPANY,        )
                               )
 9              Defendant.     )

10   ------------------------------------------------------

11

12         30(b)(6) DEPOSITION UPON ORAL EXAMINATION

13                           OF

14                    SHELLEY R. CARDIEL

15         REPRESENTING PARKER, SMITH & FEEK, INC.

16   ------------------------------------------------------

17                     July 31, 2006

18                       9:30 a.m.

19                601 Union Street, Suite 3100

20                    Seattle, Washington

21

22

23

24                   JANICE L. TEGARDEN

25                 CERTIFIED COURT REPORTER
```

Page 14

1  Q. What's the difference between an account manager and an
2     account executive?
3  A. The account executive has ultimate responsibility for
4     client relationship and is involved in the marketing aspect
5     of the account most heavily in addition to the client
6     relationship and general oversight of the account.
7  Q. So would it be fair in sort of a layman's understanding
8     that Mr. White is responsible for sort of the client
9     relationship, whereas, you are more responsible for
10    servicing the client and obtaining the insurance that they
11    require?
12 A. Correct.
13 Q. Is there anybody else at Parker, Smith & Feek that's
14    responsible for that account?
15 A. Yeah, Linda Lira.
16 Q. How do you spell her last name?
17 A. L-i-r-a.
18 Q. And what is her position?
19 A. She is the account administrator.
20 Q. You said that you held that position at one point in time?
21 A. Yeah.
22 Q. And I guess I never asked you what you did as an account
23    administrator.
24 A. An account administrator would be somebody who is at a more
25    junior level on the account; Linda shares responsibility

Page 15

1     with me for administration, file documentation,
2     certificates, and database, as far as applications and
3     exposure information regarding the client, are all her
4     responsibility.
5  Q. Is she sort of a support person for you?
6  A. Yes, she is.
7  Q. Who else?
8  A. Joe McCone.
9  Q. How do you spell that?
10 A. M-c-C-o-n-e.
11 Q. What's his position?
12 A. Joe is assistant to Linda Lira.
13 Q. And how does he fit into the picture?
14 A. He basically provides clerical; it's a training position.
15 Q. Anybody else?
16 A. Sure. How far do you want me to go? I mean, there's
17    probably --
18 Q. Well, once we get to the point where I think we're beyond,
19    I'll let you know.
20 A. Okay. That's basically commercial administrative staff.
21    In addition to that, we have construction services, which
22    is Ed Chapin.
23 Q. Ed?
24 A. C-h-a-p-i-n.
25 Q. What does he do?

Page 16

1  A. Ed's responsible for builders' risk, placement of builders'
2     risk type coverages on behalf of Wilder.
3  Q. We don't need to talk about him any further.
4         Is there anybody else that would have, say, more
5     pertinence to the type of insurance coverage that has been
6     provided through Wilder for Tesoro Alaska Company?
7  A. No.
8  Q. So we've identified the folks?
9  A. Right.
10 Q. Okay. I assume you've had, in the course of servicing
11    Wilder as a client of Parker, Smith & Feek, then,
12    involvement with the respect to issuing additional insured
13    coverage for Tesoro with respect to asphalt sales contracts
14    with Wilder.
15        Is that true?
16 A. Yes.
17 Q. Explain to me when your first involvement was with respect
18    to placing additional insured coverage for Tesoro with
19    respect to an asphalt sales contract with Wilder.
20 A. The first involvement was notice from Wilder's Alaska
21    office with a copy of a letter from Tesoro addressed to
22    Dave Dickhaus requesting additional insured status for --
23    or requesting a certificate of insurance.
24 Q. Can you identify that document for me?
25 A. I believe there's a copy of it in this grouping here

Page 17

1     (indicating). Well, I think there is.
2  Q. Hopefully wee didn't reorganize those documents.
3  A. That's okay.
4         MR. SUTHERLAND: I was going to
5     say maybe it's got a yellow sticker on
6     it.
7         THE WITNESS: Yeah, it probably
8     does.
9  A. February 9, 2004, was the first notification with that
10    document which came to us from the Alaska office --
11 Q. (By Mr. Clarkson) Of Wilder?
12 A. -- with that -- their standard request for a certificate.
13 Q. Okay.
14        MR. CLARKSON: Would it be okay to
15    go ahead and mark this as an exhibit?
16        MS. KILLIAN: Sure.
17        MR. CLARKSON: Why don't we do
18    that, then, we'll mark these two pages
19    as Exhibit 2.
20
21        (Exhibit No. 2 was marked.)
22
23        MR. SUTHERLAND: Before you
24    question her about it, is your intention
25    to include it in the order she's brought

Page 18

1   it?
2         If so, I'd suggest we should flag
3   each of these exhibits and then, you
4   know, we'd have a subset or be able to
5   locate those easier, maybe even get
6   copies made of them.
7         MR. CLARKSON: That's a good idea.
8   So I'll keep the stickies on there
9   and we'll just stick it back in the box.
10        MR. SUTHERLAND: Maybe you should
11  write "2" on the sticky just so we pick
12  up which one's which.
13        MS. KILLIAN: Can we go off the
14  record for a second here?
15        MR. CLARKSON: Yes.
16
17              (Off the record for one
18              minute at 9:40 a.m.)
19
20  Q. (By Mr. Clarkson) What we've marked as Exhibit 2, then,
21     tell us exactly what those two pages represent.
22  A. Okay. This is -- the first page is the cover page that
23     they provided to us stating who they want the certificate
24     of insurance to go to, including an address and an
25     attention and any specific statement that they -- any

Page 19

1   additional requirements, which then they attached a copy of
2   Randy Christian's letter to Dave Dickhaus at Wilder.
3   Q. So let me see if I understand a little more specifically.
4      On Exhibit 2 this is a -- is it a fax cover sheet, is
5      that what this is?
6   A. Yes, uh-huh.
7   Q. So it's a fax cover sheet that was sent to Parker, Smith &
8      Feek by Wilder Construction, correct?
9   A. Correct.
10  Q. On February 16, 2004; is that correct?
11  A. Correct.
12  Q. And it was addressed to Linda Lira?
13  A. Correct.
14  Q. It indicates that with the attachment to this, which is a
15     letter from Randy Christian of Tesoro Refining and
16     Marketing Company to Wilder Construction Company, they're
17     copying that letter to say, "Here's a contract we have with
18     Tesoro, we need insurance pursuant to that contract, can
19     you help us obtain it?"
20        Is that basically what transpired?
21  A. I think so.
22  Q. All right. And it was actually addressed to Linda Lira and
23     Shelley Cardiel?
24  A. Correct, uh-huh.
25  Q. So is this something that you would have picked up and been

Page 20

1      responsible for, then?
2   A. Yes.
3   Q. The letter from Randy Christian that was attached to this
4      fax cover sheet indicates that pursuant to the Tesoro
5      Asphalt Sales Contract entered into with Wilder, that there
6      was a paragraph in that contract, Paragraph 9(f), that
7      required insurance, correct?
8   A. Correct.
9   Q. Wilder was to provide this insurance to Tesoro's benefit,
10     correct?
11  A. Correct.
12  Q. And within that paragraph of the contract that's quoted in
13     this letter, there was a requirement, first of all, that
14     there be "general liability insurance with minimum limits
15     of $2,000,000 combined single limit per occurrence for
16     bodily injury and property damage," correct?
17  A. Correct.
18  Q. And then there was a requirement that the insurance that is
19     provided be primary coverage, correct?
20  A. Correct.
21  Q. Can you read upside down?
22  A. Well, sometimes.
23  Q. Let me see if I can read upside down.
24  A. Yeah, primary, uh-huh.
25  Q. And that the insurance that was to be provided by Wilder

Page 21

1      was also to name seller, being Tesoro, as an additional
2      insured, correct?
3   A. Yes.
4   Q. Was a copy of the contract between Wilder and Tesoro
5      provided to Parker, Smith & Feek at or around that time?
6   A. No.
7   Q. When was the first time, to your knowledge, that Parker,
8      Smith & Feek obtained an actual copy of the asphalt sales
9      contract between Tesoro and Wilder?
10  A. Never that I'm aware of.
11  Q. Never.
12        Did at some point in time you come to receive these
13     two documents marked as Exhibit 2?
14  A. On the date that they were faxed to us.
15  Q. Okay. Just sort of walk me through what transpired once
16     you received Exhibit 2.
17  A. When we received Exhibit 2, we reviewed the document.
18     These notations on here are mine (indicating), that's my
19     handwriting.
20        Reviewing what we had, which was basically only this
21     letter outlining what the requirements were, I'm noting
22     here that the waiver of subrogation required has a two
23     percent premium surcharge subject to a two hundred fifty
24     dollar minimum and that we can't provide any notification
25     of material change on "EL," which is employer's liability.

Page 22

1  So I've noted that we're not -- there's a cost to this
2  and we cannot comply with this.
3  Q. Cannot comply with what?
4  A. The requirements for notice of material change on worker's
5  compensation.
6  Q. Was there any other portion of it you indicated you
7  couldn't comply with?
8  A. No.
9  Q. Go ahead and walk me through. You told me you received
10  this.
11    You understood what the request was?
12  A. Right.
13  Q. Take me through the rest of what you did with that once you
14  received it.
15  A. Okay. Once we received that, we proceeded to issue a
16  certificate of insurance, basically meaning the other
17  requirements, and we forwarded that certificate of
18  insurance along with -- this is the certificate of
19  insurance (indicating) -- all the attached endorsements
20  along with this letter on February 18th to the attention of
21  Kathy Urquhart in the Wilder Anchorage office.
22  Q. How do you spell Urquhart?
23  A. U-r-q-u-h-a-r-t.
24  Q. Okay.
25  A. Basically telling her that we are enclosing the certificate

Page 23

1  and that we were not in compliance with the requirement for
2  notice of material change on the worker's comp, the
3  employer's liability policy, because Alaska State law
4  doesn't allow that, and that the waiver of subrogation
5  would cost a two percent premium surcharge. We included
6  both the original certificate and a copy for Wilder.
7  Q. Is that it?
8  A. Uh-huh.
9  Q. Let's do this, you've identified some additional documents
10  here today.
11    Is that something that we can mark today?
12  A. Yes, you can mark it, uh-huh.
13  Q. What we will mark as Exhibit 3 is a letter dated
14  February 18, 2004, from Parker, Smith & Feek to Kathy
15  Urquhart of Wilder, correct?
16  A. Right.
17  Q. Did you play a part in drafting this letter?
18  A. Yes, I would have. Based on my notes, I would have given
19  these notes then to Amy, who is no longer part of the
20  Wilder team but was at the time; she was in the position
21  which is now held by Joe McCone.
22  Q. Okay.
23  A. So, based on the review, she and I would have verbally
24  discussed it, and she would have drafted this based on that
25  discussion.

Page 24

1  Q. Who actually would have identified the coverages for Wilder
2  that are identified in the certificate and in the attached
3  endorsements?
4  A. Those would have been -- the endorsements are directly from
5  the policy; the certificate, we would have addressed the
6  coverages based on the paragraph that Tesoro provided.
7  Q. That's what I was trying to find out.
8    When you said, "we," I'm trying to figure who at
9  Parker, Smith & Feek was actually doing those then?
10  A. It would have been Amy and myself.
11  Q. Amy under your direction?
12  A. Yes, uh-huh.
13  Q. We've identified the cover letter is from Parker, Smith &
14  Feek to Kathy Urquhart of Wilder dated February 18, 2004.
15    And attached to that document is a certificate of
16  liability insurance, correct?
17  A. Uh-huh.
18  Q. Dated February 18, 2004?
19  A. Yeah. Actually, it's general liability, automobile, and
20  excess liability coverages.
21  Q. Thank very much.
22    And there's a little handwritten sticky note on there,
23  also.
24    Is that your handwriting?
25  A. No, that's Steve White's handwriting.

Page 25

1  Q. And then there is a series of endorsements attached?
2  A. Correct.
3  Q. The first endorsement is what? Tell us what that is.
4  A. The first endorsement is the Cancellation, Material Change
5  Endorsement which modifies the notification to the parties.
6  This is applicable to Policy KK08400385.
7  Q. Okay.
8  A. So basically complying with the requirements for
9  cancellation and material change on that policy.
10  Q. So that endorsement was intended to comply, to the best you
11  understood, Wilder's contractual obligation to Tesoro,
12  correct?
13  A. Correct.
14  Q. What's the next endorsement?
15  A. The next endorsement is the "Waiver of Rights of Recovery
16  Endorsement," again, applicable to the St. Paul policy
17  that's identified on this certificate. And that's in
18  compliance with the waiver requirements for Tesoro.
19  Q. And, again, that endorsement was intended, as best you
20  understood, to comply with Wilder's contractual
21  obligations to Tesoro?
22  A. Correct.
23  Q. All right. What's the next endorsement?
24  A. The next one is a "Contractors Recovering Damages from a
25  Third Party," which is a waiver of subrogation

Page 26

1  requirements, as well.
2  Q. Again, that endorsement was issued to Wilder, as best you
3     understood, to comply with Wilder's contractual obligation
4     to Tesoro?
5  A. Correct.
6  Q. What is the next endorsement you have?
7  A. The next endorsement is "Additional Protected Persons
8     Endorsement" to the commercial general liability.
9  Q. What was the purpose of that endorsement?
10 A. To confirm additional insured status.
11 Q. For who?
12 A. For Tesoro as noted on the cert.
13 Q. Okay. And what was your understanding of the nature of
14    Tesoro's relationship with Wilder at the time you performed
15    this service for Wilder?
16 A. Sales contract, an asphalt sales contract.
17 Q. It was your understanding that Wilder was a buyer of
18    asphalt or was a seller of asphalt?
19 A. All I know is it was an asphalt sales contract.
20 Q. All right. You understood there was an asphalt sales
21    contract and pursuant to that contract there was a
22    requirement that Wilder provide additional insured coverage
23    to Tesoro?
24 A. Correct.
25 Q. You did understand it was a buyer/seller relationship,

Page 27

1     whoever might have been the buyer and the seller?
2  A. Based on the fact that this paragraph here (indicating)
3     talks about buyer and seller.
4  Q. All right.
5  A. That's all I saw.
6  Q. Let's try to stay organized here.
7         So, do I understand correctly, that at the time you
8     issued Endorsement G0322, dated 4-1-03, which is part of
9     this Exhibit 3 that we'll mark here, it was your intention
10    that this endorsement would allow Wilder to satisfy its
11    contractual obligations to Tesoro pursuant to that asphalt
12    sales contract?
13 A. Absolutely.
14 Q. And then --
15 A. These aren't part of the same thing, those are two
16    different endorsements (indicating).
17 Q. Thank you very much.
18 A. This is the additional insured with regard to automobile
19    liability coverage (indicating).
20 Q. Oh, this is separate?
21 A. They're separate additional insured status granted by
22    virtue of the legal responsibility for protected persons,
23    which is in this (indicating).
24 Q. Thank you very much. And, again, that endorsement was
25    issued with the intention of providing Wilder the insurance

Page 28

1     is was required contractually to provide to Tesoro?
2  A. Absolutely.
3  Q. Can you put those back in the order they're supposed to be
4     in so I don't screw it up.
5  A. Sure. (The witness complies.)
6         MR. CLARKSON: So why don't we
7     mark that as Exhibit 3.
8  A. You'll probably want to include this (indicating) because
9     this is the worker's compensation certificate that was
10    delivered as part of that, along with the waiver that's
11    required for the worker's comp, so it was all delivered as
12    one packet.
13 Q. (By Mr. Clarkson) Okay. So, in addition, as part of that
14    packet that was delivered to Wilder --
15 A. Yes.
16 Q. -- there was also two additional pages you just identified
17    for us that relate to worker's comp?
18 A. Correct, correct.
19 Q. And all these documents were intended to respond to
20    Wilder's request that they be given insurance to comply
21    with their contractual obligations to Tesoro?
22 A. Yes, correct.
23        MR. CLARKSON: Let's mark that in
24    total as Exhibit 3.
25        MS. KILLIAN: Can we go off the

Page 29

1     record for a minute.
2
3              (Off the record for three
4              minutes at 9:55 a.m.)
5
6              (Exhibit No. 3 was marked.)
7
8  Q. (By Mr. Clarkson) Can you tell me what, if any,
9     conversations you had with anyone at Wilder in the course
10    of providing the insurance that we've just talked about as
11    reflected in Exhibit No. 3?
12 A. None that I'm aware of.
13 Q. Is it typical that if you've been asked for a client of
14    Parker, Smith & Feek to provide insurance that they need
15    pursuant to a contract, that you would ask for a copy of
16    the contract?
17        MR. SUTHERLAND: I'm going to
18    object to the form and I'd be happy to
19    explain why.
20        MR. CLARKSON: Sure.
21        MR. SUTHERLAND: I think it needs
22    to be clarified whether she's really
23    providing insurance or just certifying
24    what insurance Wilder has.
25        MR. CLARKSON: Well, let me be a

Page 30

1  little more specific, then.
2  Q. (By Mr. Clarkson) Did you understand that distinction?
3  A. Uh-huh.
4  Q. Can you explain how you would respond to that distinction?
5     What did you understand you were doing? I mean Parker's --
6  A. Certifying the coverage --
7  Q. -- is not providing --
8        MS. KILLIAN: Please let him
9        finish his question before you respond.
10 Q. (By Mr. Clarkson) And I asked a poor question.
11    So Parker, Smith & Feek isn't actually providing
12    insurance coverage, you are representing to Wilder the
13    insurance coverage that has been retained on their behalf
14    through an insurance carrier, correct?
15 A. Correct.
16       MR. CLARKSON: Does that --
17       MR. SUTHERLAND: I just would note
18       that there were a couple of questions I
19       didn't get a chance to jump in.
20       You were saying, "you would have
21       issued insurance," and I think in
22       reality she's issuing these
23       certificates.
24       MR. CLARKSON: That's exactly
25       correct.

Page 31

1  Q. (By Mr. Clarkson) So to the extent I've asked the
2     questions improperly, I apologize.
3        What we've been discussing, and I believe what we
4     understood but what may not have been clear for the record,
5     was that Parker, Smith & Feek's business is they are a
6     broker of insurance, correct?
7  A. Correct.
8  Q. So they obtain insurance coverages from insurance companies
9     for their clients, correct?
10 A. Correct.
11 Q. Parker, Smith & Feek doesn't actually act as an insurer and
12    provide insurance coverages?
13 A. Correct.
14 Q. So the insurance coverages that have been reflected in
15    Exhibit 3 and were transmitted by you on behalf of Parker,
16    Smith & Feek to Wilder were a representation of the
17    insurance coverages that Parker, Smith & Feek had, in fact,
18    obtained from insurance carriers on behalf of Wilder; is
19    that correct?
20 A. Correct.
21 Q. Okay. And one of the insurance coverages that Parker,
22    Smith & Feek obtained for Wilder was that which is
23    reflected in Endorsement G0322, correct?
24 A. Correct.
25 Q. And that is an endorsement that was issued by an insurer,

Page 32

1  and the insurer is St. Paul Fire and Marine Insurance
2  Company?
3  A. Correct.
4  Q. That is the endorsement that was to provide the additional
5     insured protection for Tesoro that you understood Wilder's
6     contract required?
7  A. Yes.
8  Q. All right. I was asking you about the conversations you
9     might have had with Wilder in the course of performing your
10    service in obtaining the insurance coverages that they had
11    requested, and you said you didn't believe you had any
12    conversations with anyone at Wilder; is that correct?
13 A. Correct.
14 Q. And then what I wanted to ask you next was whether it is
15    typical in the course of providing a service to a client of
16    Parker, Smith & Feek like Wilder, when they ask you for
17    insurance that they are required to obtain by a contract
18    with some other company, that you would ask to see the
19    contract that they are responding to?
20 A. To see the insurance provisions of the contract.
21 Q. So not necessarily to see the entire contract but just to
22    see the insurance provisions?
23 A. Correct.
24 Q. In your mind, by having received a letter that was marked
25    as Exhibit 2 from Mr. Christian at Tesoro Refining and

Page 33

1  Marketing Company, you had seen what you needed to see in
2  order to provide the insurance that Wilder needed to
3  respond to to the contract with Tesoro?
4  A. Correct.
5  Q. So, do I understand correctly, then, that for purposes of
6     providing the service that you provided on behalf of
7     Wilder, you took your full understanding of what they were
8     obligated to do for Tesoro contracturally from the letter
9     from Mr. Christian that we've identified as part of Exhibit
10    No. 2?
11 A. Yes.
12 Q. When you sent your letter of February 18, 2004 -- I say
13    your letter, it's Parker, Smith & Feek's letter -- to
14    Wilder Construction Company on February 18, 2004, was it
15    your understanding and intent that the insurance that was
16    reflected in the attachments to that letter satisfied
17    Wilder's contractual obligations to Tesoro to the extent
18    you understood those contractual obligations?
19 A. Yes, with the exception noted in the letter.
20 Q. Right, there is an exception noted in the letter.
21    But other than that exception, it was your
22    understanding and intent that the insurance reflected in
23    the attachments to the February 18, 2004, letter satisfied
24    Wilder's contractual obligation to Tesoro to the extent
25    you understood that contractual obligation, correct?

Page 34

1  A. Yes.
2  Q. Did you have any conversations with anybody at Wilder after
3     you sent this February 18, 2004, letter to them about this
4     insurance coverage?
5  A. No, I don't believe so.
6  Q. All right. This is in February of 2004.
7     The insurance coverages that were provided were for
8     what period of time as they related to Tesoro?
9  A. They were for the period of 4-1-2003 to 4-1-2004.
10 Q. Okay. Did you repeat this process at a subsequent time
11    with respect to Wilder and Tesoro?
12 A. On the renewal.
13 Q. When did the renewal occur?
14 A. April 1, 2004.
15 Q. Do you have documents similar to these that we looked at
16    that reflect the renewal in April --
17 A. Yes.
18 Q. -- of 2004?
19        MS. KILLIAN: You need to wait for
20    him to finish his questions.
21        THE WITNESS: Okay.
22        MS. KILLIAN: Please try and just
23    wait.
24 Q. (By Mr. Clarkson) Did you understand my question?
25 A. Yeah.

Page 35

1  Q. What have you identified for us?
2  A. This is the set of renewal documents, copies of those
3     documents.
4  Q. Can we mark these documents?
5  A. Yes.
6        MS. KILLIAN: Can we hold on for a
7     second; I'm a little concerned about
8     that. This (indicating) suggests to me
9     that this is an original.
10       THE WITNESS: No.
11       MS. KILLIAN: So after it was
12    copied someone made the pink mark?
13       THE WITNESS: Right.
14       MS. KILLIAN: You're sure of that.
15       THE WITNESS: Yeah, uh-huh.
16       MS. KILLIAN: Okay. Go ahead.
17       MR. CLARKSON: Okay. Why don't we
18    mark that as Exhibit 4.
19
20              (Exhibit No. 4 was marked.)
21
22 Q. (By Mr. Clarkson) Ma'am, do you want to take Exhibit 3 and
23    sort of slip it back where it's supposed to go for us.
24 A. (The witness complies.)
25 Q. Actually, can you identify for us again page by page what

Page 36

1     Exhibit 4 consists of?
2  A. The first page is the certificate of insurance evidencing
3     general liability, automobile liability, and excess
4     liability coverage for the '04-'05 policy term.
5  Q. And that's dated 4-1-2004?
6  A. 4-1-2004.
7  Q. Okay.
8  A. And, then, attached to that is the additional protected
9     persons endorsement, which appears on that policy for
10    general liability; the insuring agreement, which addresses
11    who is protected under the automobile liability; the waiver
12    of rights of recovery, which is attached; a cancellation
13    endorsement, which is attached for that policy term; a
14    waiver of recovery which applies, as well; and then a
15    worker's compensation certificate of insurance along with
16    the worker's comp waiver endorsement.
17 Q. Did you receive any communication from Wilder before
18    issuing the renewal in April of 2004?
19 A. They would have reviewed a list of certificates and
20    indicated whether it was to be renewed or not.
21 Q. Who is "they"?
22 A. The folks in the Wilder Anchorage office.
23 Q. And you said they would have reviewed what?
24 A. They would have reviewed a list of certificates and
25    indicated if that particular certificate was to be renewed.

Page 37

1  Q. All right. Do you have a recollection of receiving some
2     communication from Wilder indicating that they wanted these
3     particular coverages reflected in Exhibit 4 renewed as of
4     April '04?
5  A. Yes, they would have provided -- they would have provided
6     written documentation by literally marking an X next to
7     Tesoro's name on a certificate list.
8  Q. Do you have those documents here somewhere?
9  A. I don't.
10       MR. SUTHERLAND: So you're talking
11    about renewing the certificate rather
12    than renewing the insurance policy; is
13    that correct?
14       THE WITNESS: Correct.
15       MR. SUTHERLAND: All right. I
16    don't mean to interrupt.
17       MR. CLARKSON: No, that's okay.
18       MR. SUTHERLAND: But the question,
19    again, I wasn't clear if the coverage
20    was in her answer.
21       MR. CLARKSON: That's fine.
22 Q. (By Ms. Clarkson) What I was trying to ask before was do
23    you have documents here with you today that reflect
24    whatever communications Parker, Smith & Feek received from
25    Wilder in or around April of 2004?

Page 38

1  A. No.
2  Q. Are there such documents to your knowledge?
3  A. Yes.
4  Q. Where are they?
5  A. In our office.
6  Q. You do have those?
7  A. (The witness nods her head.)
8  Q. Would they be along the line of what we said previously,
9     some sort of a written communication from Wilder to Parker,
10    Smith & Feek?
11 A. No.
12 Q. What would it be?
13 A. It would be literally a list of all of the certificates
14    that had been issued the previous year and then they cross
15    them out if they don't want them and if they do want them
16    renewed they put a check mark next to them.
17 Q. All right.
18 A. So on a list would appear the name just as it appears on
19    the certificate to Tesoro Refining and Marketing Company
20    and a brief description, Tesoro Asphalt Sales, and if they
21    wanted it renewed they would check mark it.
22 Q. So if I understand correctly, what you're telling me is
23    that somewhere in and around April of 2004, before April 1
24    of 2004, you would have received this list from Wilder
25    indicating that they wanted the endorsement that you had

Page 39

1     obtained for them previously with respect to the Tesoro
2     contract renewed; is that correct?
3  A. I don't think it's a correct statement to say they want the
4     endorsement renewed, they would just say they wanted the
5     certificate renewed, which would include what we attach.
6  Q. And attached to that certificate would be, pursuant to
7     their request, the endorsement that was issued previously,
8     which is G0322, for additional insured protection for
9     Tesoro Alaska Company, correct?
10 A. Yes.
11 Q. So was it your understanding in or around April 1 of 2004
12    that Wilder was once again requiring additional insured
13    protection for Tesoro Alaska Company pursuant to some sort
14    of asphalt sales contract?
15 A. Yes.
16 Q. The documents we've marked as Exhibit 4, are these
17    documents that you then forwarded on to the Wilder
18    Construction Company?
19 A. No, they would have been forwarded directly to Tesoro.
20 Q. To Tesoro?
21 A. Uh-huh.
22 Q. Were the documents we marked as Exhibit 3 forwarded
23    directly to Tesoro?
24 A. No, they were forwarded directly to Wilder for delivery to
25    Tesoro.

Page 40

1  Q. Okay. Why were the documents in April of 2004 delivered
2     directly to Tesoro?
3  A. Renewal certificates are always directed to the cert
4     holders.
5  Q. Were copies of the certificates provided to Wilder?
6  A. Yeah.
7  Q. So you would have issued the original certificate along
8     with the attached endorsements to Tesoro with copies to
9     Wilder?
10 A. Correct.
11 Q. And that occurred around April 1 of 2004?
12 A. Correct.
13 Q. Did you, around April 1 of 2004, receive any copies of
14    asphalt sales contracts between Wilder and Tesoro?
15 A. No.
16 Q. Were you operating, when you caused the documents marked as
17    Exhibit 4 to be issued and transferred out to Wilder and
18    Tesoro as you explained to us, under the same description
19    you had previously of what the contract with Wilder and
20    Tesoro required?
21 A. Correct, it was a renewal of the exact.
22 Q. All right. So you were still working off what you
23    understood the provision to be as reflected as what we
24    marked as Exhibit 2?
25 A. Yes.

Page 41

1  Q. So the documents we marked as Exhibit 4, including the
2     Endorsement G0322 dated 4-1-'04, were intended, when you
3     issued them, to comply with Wilder's contractual
4     obligations to Tesoro as you understood those obligations,
5     correct?
6  A. Correct.
7        MR. SUTHERLAND: Do you mind if I
8     take a look at those documents?
9        MR. CLARKSON: Go ahead.
10 Q. (By Mr. Clarkson) In the course of your work for Parker,
11    Smith & Feek in servicing Wilder as a client of that
12    company, have you had occasion to obtain additional
13    protected person insurance coverages for Wilder for other
14    entities that they might have contracts with in a
15    buyer/seller sort of relationship? Do you understand my
16    question?
17 A. I can't think of one specifically.
18 Q. Is Tesoro the only one to your knowledge?
19 A. It's the only one I can think of.
20 Q. Why don't we do this, can you look at this document for me
21    and tell me if you can identify what that is? It seems to
22    be all clipped together.
23 A. (The witness complies.) This is -- appears to be a copy of
24    the St. Paul package policy for the period of 4-1-2004 to
25    4-1-2005.

Page 42

1 Q. And that's the policy for Wilder Construction Company?
2 A. Correct.
3 Q. Would that be the entirety of the policy that you all
4    obtained for Wilder from St. Paul for 2004-2005?
5 A. Without comparing it to the original I couldn't say that
6    it's the entire policy.
7 Q. Without certifying that it's the entirety of every page, it
8    appears to be what would be the policy?
9 A. It would appear, yes.
10 Q. Okay.
11       MR. CLARKSON: Maybe we can mark
12    this?
13       MS. KILLIAN: Is that a copy?
14       THE WITNESS: Yeah.
15       MR. CLARKSON: Let's make that
16    Exhibit 5.
17
18          (Exhibit No. 5 was marked.)
19
20 Q. (By Mr. Clarkson) Before we talk about that, you mentioned
21    to me that in February of 2004, February 18, 2004, there
22    was a letter that you sent to Kathy Urquhart with Wilder.
23       What I want to ask you is, was it sent to anybody else
24    at Wilder or only Kathy Urquhart?
25 A. It was also sent to Mike Fallon at Wilder.

Page 43

1 Q. Mike Fallon, okay. So those two individuals.
2    It was addressed to Kathy Urquhart and then copied to
3    Mike Fallon at Wilder Construction Company?
4 A. Correct.
5 Q. And, then, in April of 2004, the documents we marked as
6    Exhibit 4, who at Wilder were those documents forwarded to?
7 A. They -- a copy of those documents would have been provided
8    to the Wilder office in Anchorage and could have been
9    addressed to Kathy Urquhart, but I can't say for sure.
10 Q. And you're not aware of any cover document that went with
11    those documents when it was sent to Wilder?
12 A. All certificates are transmitted together, not
13    individually, in three-ring binders normally and addressed
14    to one person in particular. I'm just not sure of who that
15    person was.
16 Q. All right.
17 A. Kathy Urquhart does keep copies, most often, of
18    certificates.
19 Q. Is she the person typically you would send Wilder's
20    insurance certificates to in Anchorage?
21 A. Yes.
22 Q. What I was trying to ask you, and I probably asked really
23    poorly, was in February of 2004 there was a cover letter
24    that went with the documents you sent to Kathy, and I'm
25    just wondering if there was a similar cover letter in April

Page 44

1    of 2004.
2       Do you know?
3 A. There may have been, but it would not have been just for
4    this one, it would have been transmitting hundreds of
5    certificates relating to the account as a whole.
6 Q. And that is because why? Why is the package transmitted in
7    April so much greater than the package transmitted in
8    February?
9 A. Because this (indicating) was relating just to one
10    certificate of insurance; the transmittal at renewal time
11    transmits copies of all certificates.
12 Q. April was the renewal date for Wilder with respect to all
13    of its insurance?
14 A. Correct.
15 Q. February was a date in which you all were attempting to
16    respond to one certificate that Wilder owed to Tesoro; is
17    that correct?
18 A. Correct.
19 Q. Do you know who at Tesoro you would have sent the documents
20    marked as Exhibit 4 to?
21 A. Randy Christian.
22 Q. Is there a cover document somewhere that reflects the
23    documents that were sent to Randy Christian?
24 A. No.
25 Q. Is it your recollection that the entirety of the documents

Page 45

1    marked Exhibit 4 were sent to Randy Christian?
2 A. Yes.
3 Q. All right. Now, the document we marked as Exhibit 5 is the
4    insurance policy, correct, for Wilder?
5 A. Correct.
6 Q. This is a document that would not have been transmitted to
7    Tesoro, correct?
8 A. Correct.
9 Q. This would have just been transmitted to Wilder?
10 A. Correct.
11 Q. Do you know who at Wilder this document was transmitted to?
12 A. Mike Fallon.
13 Q. Mike Fallon.
14    Anybody else?
15 A. No.
16 Q. Kathy Urquhart?
17 A. It's possible that a copy of that policy was shared with
18    Bardie Scarbrough in the Anchorage office.
19 Q. And as part of Exhibit 5, the endorsement that had been
20    previously transmitted to Tesoro, Endorsement G0322, is
21    also included as part of that policy, isn't it?
22 A. Correct.
23 Q. Now, did it come to your attention at some point in time
24    that perhaps the Endorsement G0322 that had been issued by
25    St. Paul to Wilder that you had obtained for them from St.

Page 46

1  Paul with respect to the Tesoro asphalt sales contract did
2  not, in fact, respond perhaps to Wilder's contractual
3  obligation to Tesoro?
4       MS. KILLIAN: I'm going to object.
5    I think it calls for a legal conclusion,
6    but you can go ahead and answer.
7  Q. (By Mr. Clarkson) Sure, go ahead.
8  A. Yes.
9  Q. Tell me how you came to be aware of an issue relating to
10    that topic?
11 A. I was in a claims review meeting when the St. Paul
12    Travelers adjuster raised that possibility.
13 Q. You said you were in a claims review meeting.
14    When did that meeting take place?
15 A. October of 2005, I believe.
16 Q. Who was in attendance at that meeting?
17 A. From Parker, Smith & Feek, myself, Steve White, Ed Rhone,
18    R-h-o-n-e, Sandra Lester-Huffman, H-u-f-f-m-a-n; from
19    Wilder, Mike Fallon, Bardie Scarbrough.
20 Q. How do you spell that?
21 A. S-c-a-r-b-r-o-u-g-h.
22 Q. And what was the first name?
23 A. Bardie, B-a-r-d-i-e.
24 Q. Is he with Wilder?
25 A. Yes.

Page 47

1  Q. Is that a man?
2  A. A man, yes, male.
3  Q. Anybody else?
4  A. From St. Paul, Travis Phillips, John Lewis, I believe, and
5    a woman whose name completely escapes me.
6  Q. Someone from St. Paul?
7  A. Somebody from St. Paul.
8  Q. An unknown woman.
9  A. Let me --
10      THE WITNESS: Somebody else could
11    help me here.
12 Q. (By Mr. Clarkson) That's okay, we'll just get your
13    recollection.
14 A. Yeah. Boy, I can't think of her name. And I believe one
15    other person from St. Paul along with a couple of people
16    that were on conference call.
17 Q. Who were the people on the conference call?
18 A. One of the individuals that was on conference call was a
19    large-loss specialist out of Denver.
20 Q. Is this a person with St. Paul?
21 A. Yes, whose name I don't recall.
22 Q. That's all right.
23    Anybody else?
24 A. And a couple of other claims adjusters on individual
25    claims.

Page 48

1  Q. Is the name Don Stoeckel?
2  A. From Denver.
3  Q. That was the Denver person?
4  A. I think it is, yeah, that rings a bell.
5  Q. And you thought maybe a couple other claim-adjuster type
6    persons?
7  A. Yeah, uh-huh.
8  Q. Any names you recall there?
9  A. No.
10 Q. This meeting got called how?
11 A. We hold these meetings on a regular basis to review open
12    claims with the carrier, the client, and the broker
13    present.
14 Q. So the carrier in this case is St. Paul?
15 A. Correct.
16 Q. The client is Wilder?
17 A. Correct.
18 Q. And the broker is Parker, Smith & Feek?
19 A. Correct.
20 Q. And this is a meeting that is held regularly when, what is
21    it that triggers these meetings? Are they just regular
22    meetings held how often? How frequently?
23 A. Usually at least annually.
24 Q. Do you recall this being an annual meeting that was being
25    held?

Page 49

1  A. Yes.
2  Q. Was there anything in particular that triggered this
3    meeting being held in October or was it just that was the
4    time to hold the meeting annually?
5  A. That's normally when they're held.
6  Q. Tell me what, if anything, was discussed at this meeting
7    with respect to the topic of whether or not the additional
8    protected insured endorsement that had been issued to
9    Wilder pursuant to its contractual obligations to Tesoro
10    did what it was supposed to do?
11 A. During the discussion of the status of the Tesoro claim one
12    of the adjusters said something to the effect of "We didn't
13    owe them additional insured status under the policy."
14 Q. Who was that, Mr. Stoeckel?
15 A. I don't believe it was Mr. Stoeckel, it was somebody that
16    was in the room.
17 Q. Okay.
18 A. It might have been John Lewis.
19 Q. Did Mr. Lewis elaborate or explain why he thought that was
20    true?
21 A. I believe we stopped the conversation at that point and
22    asked what he was referring to, what his -- what the
23    position was, and he advised us that St. Paul was looking
24    into it further but that they were -- that St. Paul
25    Travelers was anticipating denying based on the additional

Page 50

1  insured.
2  Q. So he identified for everyone at the meeting that there was
3     an issue about whether or not the endorsement, G0322,
4     provided additional insured protection to Tesoro with
5     respect to a particular claim that had arisen or just in
6     general? Was it a particular claim you were discussing?
7  A. With regards to the fatality claim that had been presented.
8  Q. And the claim that was being discussed was a claim by the
9     wife of a gentleman named Larry Rogers who had died at the
10    Tesoro refinery or the asphalt rack sometime in October of
11    2004; is that correct?
12 A. Correct.
13 Q. So Mr. Lewis, perhaps, as you recall, identified that there
14    might be an issue with respect to whether or not that
15    additional protected insured coverage had, in fact, been
16    obtained with respect to the Rogers' claim, but St. Paul
17    had not fully analyzed the issue and let you all know that
18    they were looking at it.
19        Is that a fair assessment of what was communicated at
20    that time?
21 A. Correct.
22 Q. Was there any other discussion on that topic?
23 A. There was; we questioned that position.
24 Q. Tell me how and why and who questioned it.
25 A. Well, I certainly questioned it. I think others did as

Page 51

1  well, both from Parker, Smith & Feek and from Wilder asking
2  what grounds they felt they didn't have -- why the
3  additional insured status wasn't appropriate under the
4  blanket additional insured endorsement that was attached to
5  the policy.
6  Q. Was it your understanding at that time that the endorsement
7     that had been issued by St. Paul to Tesoro did, in fact,
8     provide additional insured coverage to Tesoro with respect
9     to the Rogers' claim?
10         MS. KILLIAN: I'm going to object
11     to the form.
12         You can go ahead and answer.
13 A. Did I believe that it provided the additional insured
14    status, is that the question you're asking me?
15 Q. (By Mr. Clarkson) Yes.
16 A. Yes.
17 Q. Why?
18 A. Because the broad addit -- blanket additional insured
19    endorsement on the policy provides coverage to all parties
20    as required under contract with -- as it relates to the
21    operation of the insured.
22 Q. Back in April of 2004 and February of 2004 when you
23    obtained the endorsement, G0322, for Wilder on behalf of
24    Tesoro, was it your understanding that you were arranging
25    endorsements for additional protected insureds for Wilder

Page 52

1  on behalf of Tesoro that would cover claims like the
2  Rogers' claim?
3       MS. KILLIAN: Object to the form.
4  A. Yes.
5  Q. (By Mr. Clarkson) Was it your understanding at the time
6     that that was what part of the request that Wilder was
7     making of Parker, Smith & Feek, insurance coverages of that
8     type?
9       MS. KILLIAN: Object to the form.
10      MR. SUTHERLAND: I join.
11 A. Yes.
12 Q. (By Mr. Clarkson) Okay. I interrupted you and I
13    apologize. Take me through the rest of that meeting in
14    October of 2005 when you all were discussing the issue of
15    whether or not that endorsement, in fact, provided
16    additional insured protection to Tesoro with respect to the
17    Rogers' claim in particular.
18        Was there any other discussion at all?
19 A. Yes.
20 Q. Take me through the whole discussion.
21 A. I questioned the St. Paul folks that were there. The other
22    person who was in that meeting is Michael Boele, B-o-e-l-e.
23 Q. Who is he with?
24 A. He's with St. Paul Travelers. He's the -- he was the
25    underwriter at that time.

Page 53

1  Q. Michael Boele?
2  A. Michael Boele, B-o-e-l-e.
3  Q. What was his position, again?
4  A. He was the underwriter St. Paul Travelers assigned to the
5     Wilder account.
6  Q. Where is he? Is he in Seattle?
7  A. No, he's in Walnut Creek, California.
8  Q. So he was on the phone?
9  A. No, he was present.
10 Q. He was here in person?
11 A. He was here in person for the meeting.
12 Q. Okay. I interrupted you again.
13        What was the discussion with Mr. Boele?
14 A. So I questioned how it was possible that St. Paul could
15    consider denying the additional insured to Tesoro based on
16    form given that there was no other additional insured form
17    available to us and attached to the policy with the
18    exception of additional insured status for a government
19    entity permit and equipment rental.
20 Q. What was Mr. Boele's response?
21 A. He didn't know.
22 Q. Let me ask you to explain what you mean by that was the
23    only form, what do you mean by that?
24 A. The blanket additional insured form attached to the Wilder
25    policy.

Page 74

1  at "11:44 a.m." confirming to him that we're looking for
2  additional insured grant to Tesoro by Wilder's GL. That
3  was prior to my response.
4      MR. CLARKSON: Well, let's mark
5      that E-mail as Exhibit 9B.
6
7      (Exhibit No. 9B was marked.)
8
9  Q. (By Mr. Clarkson) What did you understand Ms. Lira to be
10     saying in her E-mail we've marked as Exhibit 9B? What was
11     your understanding of what she was saying?
12 A. She was responding to his -- she was responding to his
13    comments about what Wilder should have done and what Weaver
14    should have done by saying, "We're looking for an
15    additional insured grant to Tesoro under Wilder's GL,"
16    directing him back to the subject which was the original
17    question of "What do we attach to Wilder's general
18    liability policy in order to comply?"
19 Q. In order to comply with the Tesoro asphalt --
20 A. The Tesoro agreement, correct.
21 Q. -- sales contract?
22 A. Correct.
23 Q. Are there any more communications that precede Exhibit 10?
24 A. No, I don't think so.
25 Q. All right. So we've talked about Exhibit 10. Let's go to

Page 75

1  the next communication after Exhibit 10.
2  A. Okay. It appears that the next communication after Michael
3     Boele's request for "It's best if I see a copy of the
4     contract," I responded to him that evening and said, "Well,
5     you know what the relationship is with Tesoro, we buy
6     product for them and have others pick it up. The agreement
7     with Tesoro requires Wilder to name them as additional
8     insured. I just need to have you tell me which additional
9     insured endorsement provides coverage for this third party
10    entities. I think you already have a copy of the agreement
11    but if you don't let me know."
12      MR. CLARKSON: Let's mark that as
13      Exhibit 11.
14
15      (Exhibit No. 11 was marked.)
16
17 Q. (By Mr. Clarkson) So, as of March 9, 2006, at six
18    forty-five p.m. you understood that the relationship was
19    Tesoro selling product to Wilder, correct?
20 A. Correct.
21 Q. And someone else picking up that product, correct?
22 A. Correct.
23 Q. Now, when you forwarded the endorsements to Wilder back in
24    2004, February and April, did you understand that the
25    endorsements that were being sent would provide insurance

Page 76

1  coverage as you described it in your E-mail of March 9,
2  2006?
3      MR. SUTHERLAND: I'll object to
4      the form.
5      MS. KILLIAN: Do you understand
6      his question?
7      THE WITNESS: I do.
8  A. Yes, though I did not know at the time that this was issued
9     that there was a third-party picking up product.
10     MS. KILLIAN: Can you identify
11     "this" for the record.
12     THE WITNESS: I'm sorry.
13 Q. (By Mr. Clarkson) Just by exhibit number.
14 A. Exhibit 2.
15     MS. KILLIAN: I just paused for a
16     second, could I have that last question
17     and answer read back.
18     MR. CLARKSON: No problem.
19
20     (The court reporter reads back.)
21
22 Q. (By Mr. Clarkson) So, do I understand correctly, that in
23    February of 2004 and April of 2004, when you forwarded
24    these Endorsements G0322 to Wilder and Tesoro, it was your
25    understanding that the endorsement would provide additional

Page 77

1  insured coverage to Tesoro in the buy/seller contact of
2  their relationship with the exception of you were not aware
3  that there was a third party picking up the asphalt?
4  A. Correct.
5      MR. SUTHERLAND: I wanted to get
6      an objection to the form of that
7      question.
8      MR. CLARKSON: Not a problem.
9  Q. (By Mr. Clarkson) Did we finish with that communication or
10    did we mark it as an exhibit, yet?
11 A. We did that.
12 Q. Why don't we go to the next communication after that
13    March 9, 2006, six forty-five p.m. communication.
14    What is the next one?
15 A. That is -- the next one is Michael Boele's response of
16    "March 10, 9:37 a.m."
17     MR. SUTHERLAND: We have that on
18     this (referring to Exhibit 11).
19     MR. CLARKSON: It is?
20     MR. SUTHERLAND: At the top
21     (indicating).
22     MR. CLARKSON: Oh, okay.
23 Q. (By Mr. Clarkson) So we can actually stay with the same
24    exhibit.
25 A. Okay.

Page 78

1  Q. Why don't we look at Exhibit 11.
2  A. (The witness complies.)
3  Q. Is that the response to your E-mail?
4  A. Yes.
5  Q. And it's dated March 10 at nine thirty-seven a.m.?
6  A. Correct.
7  Q. So actually we've got two communications reflected on
8     Exhibit 11, correct?
9  A. Correct.
10 Q. Go ahead and tell us what Mr. Boele's response was on
11    March 10th.
12 A. Mr. Boele responds, "I don't think the issue is with what
13    AI form we are using to provide AI status to Tesoro. The
14    problem comes in with who Wilder is using to pick up the
15    product. If Wilder is picking up the product and has named
16    Tesoro as an additional insured on the GL, there is nothing
17    further to do. Your problem comes in if Wilder is
18    subcontracting out the pick up and delivery of the product
19    to a third party. What needs to be done here is for Wilder
20    to be named as an AI on the GL and AL of the party doing
21    the pick up and delivery, and this party should also be
22    naming Tesoro in this specific case as an AI on their AL
23    and GL also. This allows for the damages caused by the
24    lower tier contractor/hauler to be passed back to them, or
25    at least protects Wilder and the supplier of a product.

Page 79

1     In any case, Wilder should not be naming the party who is
2     doing the pick up of product on their behalf as an
3     additional insured. In any case the AI status should be
4     provided to Wilder and the supplier of product by the
5     company doing the pick up and delivery. Does this answer
6     your question?"
7  Q. Okay. Did you understand Mr. Boele to be saying to you, in
8     answer to your question, that based on the relationship of
9     Wilder as a purchaser and Tesoro as a seller of asphalt and
10    a third party doing the pick up of the asphalt, that Wilder
11    contractually should have looked to the transporter,
12    Weaver Brothers, to provide additional insured protection
13    for both Wilder and Tesoro?
14 A. That's what he said.
15 Q. What's the next communication after that?
16 A. Steve White responded at "9:41 a.m." on March 10th to
17    Michael.
18 Q. What did Mr. White say?
19 A. "Michael, we know about contract administration. Our
20    contract requires the AI status provisions. Mr. Fallon as
21    risk manager certainly will deal with transfer of risk to
22    third parties. Let's get over the first hurdle, first,
23    please."
24 Q. What did you understand Mr. White to be saying to Mr.
25    Boele, in layman's terms?

Page 80

1  A. That he was frustrated with him not answering the question.
2  Q. Okay. What specifically did you understand the question to
3     be that Mr. White was saying, "Please answer Mr. Boele"?
4  A. Which additional insured endorsement should we be issuing
5     to Tesoro to comply with the contract requirements.
6  Q. All right. The asphalt sales contract required Wilder to
7     provide additional insured protection to Tesoro.
8     And the question was "How does Wilder go about
9     providing that insurance coverage;" is that correct?
10 A. That was the question.
11        MR. SUTHERLAND: I'll object to
12    the form.
13        MR. CLARKSON: Let's mark that as
14    the next exhibit.
15
16        (Exhibit No. 12 was marked.)
17
18 Q. (By Mr. Clarkson) The E-mail that we just discussed, which
19    is "From: Mr. White To: Mr. Boele" of "March 10, 2006 at
20    9:41 a.m.," we just marked that as Exhibit 12; is that
21    correct?
22 A. Correct.
23 Q. What's the next communication in chronological order?
24 A. "March 13, 10:57 a.m."
25 Q. What time is that again?

Page 81

1  A. "10:57 a.m."
2  Q. Okay.
3  A. From Michael Boele to me.
4  Q. What did Mr. Boele say?
5  A. "Would this AI form achieve what you are looking for on
6     Wilder for contracts like the one you have with Tesoro?"
7  Q. And did he attach a form to that?
8  A. He attached the "Additional Insured-Designated Person or
9     Organization," Endorsement "GC T4 91 11 88" Edition.
10 Q. Did you review that form once you received it from Mr.
11    Boele?
12 A. Yeah.
13 Q. Did you come to the conclusion that that would satisfy
14    Wilder's contractual obligation to Tesoro?
15 A. Yes.
16 Q. I didn't ask you this before but let me ask you this now,
17    while these E-mails were being transmitted back and forth
18    between all the parties we've been discussing, were there
19    communications going on between members of the Parker,
20    Smith & Feek team about communications?
21 A. Yes.
22 Q. Tell me about those communications internally within
23    Parker, Smith & Feek.
24 A. Well, I think internally the communications were
25    frustration with what we viewed as a refusal to answer the

Page 82

1  question and respond to the issue by ducking it by bringing
2  up other issues relating to agreements with Weaver or risk
3  management techniques by Wilder versus just answering the
4  question "What form should we be using."
5  Q. The questions that you were asking related to what forms
6     were to be used by Wilder to provide the additional insured
7     protection that the contract to Tesoro required, correct?
8  A. Correct.
9  Q. And the answers you were getting from St. Paul related to
10    how the contractual relationships might be differently
11    arranged so as to provide additional insured protection to
12    Tesoro.
13       Is that fair?
14 A. By other parties.
15 Q. Right, by other parties other than Wilder?
16 A. Correct.
17 Q. And what you were looking for was a response to how does
18    Wilder get the insurance coverage from St. Paul to do what
19    the contract required, correct?
20 A. Correct.
21 Q. And "the contract" being the Tesoro asphalt sales contract?
22 A. Correct.
23       MR. CLARKSON: Let's mark this as
24    Exhibit 13 before we do that.
25

Page 83

1       (Exhibit No. 13 was marked.)
2
3  Q. (By Mr. Clarkson) We marked as Exhibit 13 the E-mail from
4     Mr. Boele back to you dated March 13, 2006, correct?
5  A. Correct.
6  Q. And attached to that is the endorsement that you told us
7     about, "CG T4 91 11 88"?
8  A. Correct.
9  Q. Was that endorsement used at some point in time with
10    respect to Wilder and Tesoro?
11 A. Yes, after that communication.
12 Q. Tell me when and how that came about.
13 A. On the 14th of March we responded back that "This form
14    appears to be acceptable" and that "We will reissue the
15    Tesoro certificate and others like it immediately and
16    provide you copies."
17 Q. And when you say, "others like it," what does that refer
18    to?
19 A. If there were any other existing certificates that were
20    similar in nature at the time.
21 Q. Meaning for others?
22 A. Similar to the arrangement of supply delivery, product
23    sales, that we would then utilize that endorsement form for
24    those, as well.
25 Q. So, in other words, you're referring to other clients of

Page 84

1  Parker, Smith & Feek at that point in time?
2  A. No, Wilder, just Wilder.
3  Q. Just Wilder?
4  A. Just for that policy.
5  Q. Oh, I see. Meaning if Wilder had other buyer/seller
6     relationships that require additional insured protection to
7     be provided to a seller, you would utilize that new form in
8     those situations, as well?
9  A. Correct.
10 Q. Okay. Thank you.
11       MR. CLARKSON: Let's mark that as
12    the next exhibit in order.
13
14       (Exhibit No. 14 was marked.)
15
16 Q. (By Mr. Clarkson) We've marked as Exhibit 14 that
17    March 14, 2006, E-mail from you back to Mr. Boele; is that
18    correct?
19 A. Correct.
20 Q. Okay. Is there another communication following that or
21    have we sort of exhausted those communications?
22 A. No, we then -- the next communication is from Joe McCone to
23    Michael Boele transmitting a copy of the revised Tesoro
24    certificate with additional insured forms.
25 Q. What's the date of that?

Page 85

1  A. That is March 31, 2006.
2       MR. CLARKSON: Let's mark that as
3     Exhibit 15.
4
5       (Exhibit No. 15 was marked.)
6
7  Q. (By Mr. Clarkson) Exhibit 15 is an E-mail from Joe McCone
8     of Parker, Smith & Feek, correct?
9  A. Correct.
10 Q. To Mr. Boele, correct?
11 A. Yes.
12 Q. Copied to you, Linda Lira, and Steven White?
13 A. Yes.
14 Q. And attached to that is the revised Tesoro certificate of
15    insurance with additional insured forms, correct?
16 A. Yes.
17 Q. Okay. So what was being transmitted with Exhibit 15, along
18    with other things, is a copy of that Endorsement "CG T4 91
19    11 88" that has been filled in with the name of the person
20    or organization covered as an additional insured being
21    Tesoro Refining and Marketing Company, correct?
22 A. Correct.
23 Q. How did Tesoro Refining and Marketing Company come to be
24    typed onto this form attached to Exhibit 15?
25 A. We would have filled it in on that form in our office,

Page 86

1   Parker, Smith & Feek.
2   Q. Okay. Did someone receive a response from Mr. Boele to
3      that March 31st E-mail?
4   A. Not that I'm aware of.
5   Q. Has there been any communication at all between Parker,
6      Smith & Feek and St. Paul with respect to that new
7      endorsement that was issued on March 31, 2006?
8   A. No.
9   Q. No communication back saying, "That won't work"?
10  A. No.
11  Q. No communication either way saying, "It will work"?
12  A. No.
13  Q. Just no communication?
14  A. No.
15  Q. Are there any other communications on this subject that we
16     haven't looked at?
17  A. No.
18  Q. All right.
19         MR. CLARKSON: Since we're sort of
20      ready to move on to something else, why
21      don't we take a lunch break. We can
22      meet back here at, say, one o'clock?
23         MR. SUTHERLAND: Well, I need more
24      time.
25         MR. CLARKSON: Well, let's make it

Page 87

1   one thirty.
2
3      (A noon recess was taken at 11:55 p.m.)
4
5          A F T E R N O O N   S E S S I O N
6
7      (The deposition resumed at 1:30 p.m.)
8
9   BY MR. CLARKSON:
10  Q. Back on the record, and you're still under oath.
11  A. Yes.
12  Q. Some of the files you brought with you this morning I've
13     pulled out of the box here to look at.
14         This is a file that has an '03 date on it it appears;
15     is that correct?
16  A. Uh-huh.
17  Q. Can you just identify what that file is for us?
18  A. This is the 4000 -- or the 41 2002 to 2003 policy.
19  Q. For Wilder?
20  A. For Wilder; package policy, including GL auto and umbrella.
21  Q. I've noticed that contained within that file appears to be
22     a complete copy of the policy for Wilder as of that period,
23     which is '02 to '03?
24  A. Correct, it should be including endorsements.
25  Q. And one of the endorsements included in that policy is, in

Page 88

1   fact, the G0322 endorsement form "Revised 12-97" that we
2   have, in fact, seen a copy of previously, correct?
3   A. Well --
4   Q. This is '02 to '03?
5   A. Right, this is an earlier year.
6   Q. This is the same form but for earlier year, '02 to '03?
7   A. Correct.
8   Q. Is it correct for me to assume, then, that Wilder had, in
9      fact, had this Endorsement G0322 in place for the '02 to
10     '03 period of time?
11  A. Yes.
12  Q. And is that endorsement in the exact same form that it was
13     in later for the '03 to '04 period?
14  A. I believe so.
15         MS. KILLIAN: Why don't you check
16      that.
17  Q. (By Mr. Clarkson) Yes, why don't you check it to make
18     sure.
19  A. Let me make sure that it's the same edition date. "12-97
20     Edition" date, uh-huh.
21  Q. Okay. And the language?
22  A. It's -- the language that's been added is the same. I
23     think it's got writing on the back. Yeah, one doesn't have
24     the writing on the back.
25         MS. KILLIAN: Right.

Page 89

1   Q. (By Mr. Clarkson) Why don't we do this, I actually have
2      the '04 --
3   A. And '05?
4   Q. -- and '05 files here, which are also in the box you
5      brought with you today, correct?
6   A. Correct.
7   Q. Why don't you do this for me, we can go off the record and
8      let you take some time and then I can ask you some
9      questions, but kind of what I want to find out is I have a
10     feeling that it appears that the Endorsement G0322 that was
11     copied to Wilder and Tesoro in February and April of '04
12     had, in fact, been in place for the '02-'03 period, the
13     '03-'04 period, and the '04-'05 period, and that's what I
14     would like you to identify for me.
15  A. Okay.
16  Q. So why don't you go ahead a take a look.
17         MS. KILLIAN: And it's possible
18      some copies were made or at least a copy
19      was made that didn't copy the second
20      page.
21         MR. CLARKSON: Right, I want to
22      see if they're identical all the way
23      through.
24
25         (Off the record for one

Page 106

1  Is that true?
2     MS. KILLIAN: I'm going to object
3     to the form.
4  Q. (By Mr. Clarkson) Well, that's a bad question, let me ask
5     it a better way.
6     What I'm trying to ask is this, the endorsement, in
7     the way it's issued and worded, is that it would apply to
8     "Any person or organization that you" -- meaning Wilder,
9     correct? --
10 A. Correct.
11 Q. -- "Agree in a written contract of agreement to add as an
12    additional protected person," correct?
13 A. Correct.
14 Q. That's not limited to Tesoro Alaska Company, is it?
15 A. No.
16 Q. That's not limited to Tesoro Refining and Marketing
17    Company, is it?
18 A. No.
19 Q. It would relate to any person or organization to whom
20    Wilder would have a contractual agreement to add that
21    entity as a protected person, correct?
22 A. Correct, that's why it's referred to as a "blanket
23    additional insured."
24 Q. Right. Now, focusing your attention on that, what I'd like
25    to find out just from your knowledge, do you know of any

Page 107

1     claims in that '02-'03, '03-'04, '04-'05 period of time
2     that came in against any entity other than Tesoro that was
3     an additional insured to Wilder? Does that make sense? Do
4     you understand the question?
5  A. I understand what you're asking. Without having claims
6     files in front of me I couldn't tell you whether there had
7     been one or not.
8  Q. Nothing in your memory at this point?
9  A. Nothing in my memory, no.
10 Q. Were there other entities like Tesoro, to your knowledge,
11    that were protected by the G0322 endorsements that we've
12    seen?
13 A. Hundreds.
14 Q. Hundreds. All right.
15 A. Hundreds.
16 Q. And if we were going to look to see if there were claims
17    made against those entities where would we go to look?
18 A. Claims records; loss runs would provide you with the list
19    of all of them, all of the claims that had occurred during
20    those time periods. And then you'd have to look to each
21    individual file as to whether there had been a response on
22    behalf of additional insureds.
23 Q. If I asked you this already, I apologize, are you aware of
24    any other organizations or companies that were covered by
25    those endorsements out of a buyer/seller relationship with

Page 108

1     Wilder similar to the Tesoro relationship? Are you aware
2     of anybody else like that?
3  A. I don't have any specific recall of a similar nature.
4  Q. Okay.
5  A. But it's possible that -- it's possible that there are.
6  Q. And to determine that where would we go to look, would we
7     have to look at --
8  A. You'd have to look at all of the certificates of insurance
9     that were issued.
10 Q. For Wilder along with those policies?
11 A. On behalf of Wilder to a third party.
12 Q. I understand, I misspoke. Thank you very much.
13    Certificates issued to those other entities on behalf
14    of Wilder?
15 A. Correct.
16 Q. All right. And those would be in Parker, Smith & Feek's
17    possession?
18 A. Right.
19 Q. They'd also be in Wilder's possession?
20 A. Wilder would have possessed them all at some point. I
21    don't know what thier -- I don't know what their file
22    retention policy is.
23 Q. Do you have any recollection of using any version of an
24    Endorsement Form G0322 for Wilder that had language typed
25    in different than what is reflected at the bottom of the

Page 109

1     endorsement as part of Exhibit 3?
2  A. Certainly not after this point in time but previous; I
3     don't know how old the oldest policy is that I have here.
4     I don't know if prior to this period that language may have
5     been different.
6  Q. What is the earliest policy you have here today?
7  A. It's this one (indicating).
8  Q. This is the '99-2000 file.
9     Please find the endorsement in there, if you can.
10 A. (The witness complies.) That one has the G0322 Edition
11    12-97; however the language on it is different, the add-in
12    language is slightly different.
13 Q. And what is the add-in language on that?
14 A. The language on this one says, "Any person or organization
15    you are required in a written contract to show as an
16    additional protected person," period.
17 Q. And that's the endorsement that is effective for what
18    period of time?
19 A. This actually is a two-year policy, it ran from 4-1-98 to
20    4-1-2000.
21 Q. That's an original, correct?
22 A. Yes, it's an original.
23    MR. CLARKSON: Can we mark that as
24    an exhibit on a sticky as the next
25    exhibit in order.

Page 110

1
2              (Exhibit No. 20 was marked.)
3
4  Q. (By Mr. Clarkson) And keep that there, I might ask you a
5     question about that.
6        Can we go to the next file in order; that would be
7     the '0 --
8  A. '00-'01.
9  Q. Do we have that file here?
10 A. We should.
11 Q. Let's go ahead and I'll hand you two more files.
12       Why don't you identify what those are for us?
13 A. Okay. This is the 4-1-2000 to 4-1-2001 package file
14    including the general liability.
15 Q. Would you find the endorsement for this additional
16    protected person in that policy for me.
17 A. (The witness complies.) "G0322 Edition 12-97."
18       MR. CLARKSON: Let's mark that as
19    Exhibit 21 on the sticky.
20
21             (Exhibit No. 21 was marked.)
22
23 A. The language on Exhibit 21 is slightly different from the
24    language on Exhibit 20.
25 Q. (By Mr. Clarkson) How is it different?

Page 111

1  A. Exhibit 20 says, "Any person or organization you are
2     required in a written contract," and Exhibit 21 says,
3     "required in a contract," so the word "written" is not
4     included in Exhibit 21.
5  Q. Is that the only difference?
6  A. That appears to be the only difference, right.
7  Q. Do you know why that's different?
8  A. Because it's broader, not limiting it to just written
9     contracts but nonwritten contracts or agreements.
10 Q. So, to your understanding, is that an intentional
11    difference? I mean, do you have any understanding as to
12    whether that was an intended difference as opposed to just
13    an inadvertent difference?
14 A. I think it was intended to broaden.
15 Q. Do you have a recollection?
16 A. That's the way we'd prefer it, not to be limited to
17    written, so my guess is we would have asked to remove the
18    reference to "written contract."
19       MS. KILLIAN: I'm just going to
20    ask you not to speculate, if you just
21    totally speculated. If you have an
22    educated memory, that's fine, if you
23    think it's more probably true than not,
24    but if you're just speculating, I'm
25    going to ask you not to do that.

Page 112

1  Q. (By Mr. Clarkson) Do you understand the distinction?
2  A. Yes.
3  Q. What do you think it is? I don't want you to guess either
4     but what I'd like to find out is, is there a way you can
5     look at a file and determine whether it was a requested
6     change?
7  A. I couldn't find it in that file, no.
8  Q. Where would you find if?
9  A. We would find it in the marketing file.
10 Q. Oh, okay.
11 A. As to how it was what -- what I'm saying is it is a habit
12    that we request the language to be without the limitation
13    of "a written."
14 Q. All right. Well, what we were doing before I got
15    sidetracked here you were looking for me at the 2000-2001
16    policy.
17       Now go to the next one.
18 A. Okay. This is the 2001-2002.
19 Q. Find the additional protected person endorsement in that
20    policy and we'll mark it as Exhibit 22 on a sticky.
21    (The witness complies.)
22
23             (Exhibit No. 22 was marked.)
24
25 Q. (By Mr. Clarkson) And what form is that endorsement in for

Page 113

1     that period of time?
2  A. For 2001-2002 it's form "G0322 Edition 12-97."
3  Q. And the language is?
4  A. And the language is the same as Exhibit 21, "Any person or
5     organization you are required in a contract to show as an
6     additional protected person."
7  Q. And that was Exhibit 22 we marked that as, correct?
8  A. Correct.
9  Q. It appears, then, that there was a slight change in the
10    language from 2000 to 2001, and that was the deletion of
11    the word "written" with respect to "contract," correct?
12 A. Correct.
13 Q. And then we saw that there was another change to that
14    typed-in language on the endorsement for what period of
15    time, when did the next change happen?
16 A. I believe it was 2002.
17 Q. To 2003?
18 A. 2002-2003 term.
19 Q. All right.
20       MR. CLARKSON: Let's mark this as
21    the next exhibit in order on a sticky.
22
23             (Exhibit No. 23 was marked.)
24
25 Q. (By Mr. Clarkson) And the change that was made in that

Page 114

1  typed-in language for the '02-'03 policy period was the
2  addition of an additional sentence, correct?
3  A. It appears that there's more than one change, the term
4     "written contract," it actually changes in that now it
5     says, "in a written contract or agreement."
6  Q. Okay.
7  A. "To add as an additional protected person," and then it
8     goes on to say, "but we won't apply this endorsement to
9     your maintenance, operation, or use of equipment leased
10    from that person or organization."
11 Q. All right.
12 A. "Instead will apply the equipment lessor section to them."
13 Q. Do you have any recollection or understanding as to why
14    that endorsement was changed for that period of time?
15 A. Underwriting change.
16 Q. Ma'am, thank you very much. I have no further questions
17    for you. Mr. Sutherland, I'm sure, has some questions for
18    you.
19           MR. SUTHERLAND: I do.
20           Can we take a brief break?
21           MR. CLARKSON: Yes, let's do that.
22
23                (A five-minute recess
24                 was taken at 2:16 p.m.)
25

Page 115

1                    C R O S S - E X A M I N A T I O N
2
3  BY MR. SUTHERLAND:
4  Q. Did you have any idea when you first received the document,
5     Exhibit 2, from Wilder Construction in Anchorage what was
6     meant by the term "ongoing sales contract" that's used in
7     the note that's addressed to Linda?
8  A. I don't know what the term "ongoing" refers to.
9  Q. Have you ever learned for how long a period of time Wilder
10    has been in the habit of buying asphalt from Tesoro?
11 A. No, I'm not aware of that.
12 Q. On or about this time frame is the first you ever knew of
13    it?
14 A. Correct.
15 Q. Do you know David Dickhaus in Anchorage?
16 A. Yes.
17 Q. Do you deal with him in regard to any insurance
18    requirements that Wilder has?
19 A. Rarely.
20 Q. Okay. How do you know him?
21 A. I know him from having worked with the account for years
22    and having met him at seminars and such.
23 Q. We've seen old files back to the '98 through 2000 policy
24    period.
25       How far back do they go before that if we had the very

Page 116

1  first Wilder policy that you were working with?
2  A. I think it's 1992 or '93.
3  Q. My question wasn't too precise, but from '92-'93 then it
4     was with St. Paul?
5  A. Correct.
6  Q. And it was always St. Paul, not one of the companies that
7     took over, like USF&G?
8  A. Always St. Paul.
9  Q. All right. I apologize if any of these questions seem
10    redundant, I just want to be clear because you are
11    testifying on behalf of Parker, Smith & Feek, and I want to
12    get a fairly clear picture of how this all came to be.
13       Do you know if anybody at Parker, Smith & Feek had a
14    dialog with Wilder about what Paragraph 9(f), which is
15    quoted in a letter, what that required of Wilder?
16 A. No, I'm not aware of any conversation, and since there
17    isn't one noted on there it's not likely that one took
18    place.
19 Q. But this is your handwriting?
20 A. That's my handwriting.
21 Q. So even though Linda got the note you would have taken the
22    responsibility for looking at this and acting on it?
23 A. Well, the note actually came to both, it's addressed to
24    both Linda and I, so when it came in it would have been
25    directed to both of us.

Page 117

1  Q. I see. So he could have said Linda/Shelley?
2  A. Correct.
3  Q. You don't recall ever having any questions and calling
4     anybody up in Anchorage on this?
5  A. No, no.
6  Q. Do you know whether any buyers' representative as opposed
7     to the buyer carried insurance in any of these respects as
8     called out in Paragraph 9(f)?
9  A. No.
10 Q. You did understand that the buyer was Wilder?
11 A. Yes.
12 Q. And that the seller was Tesoro?
13 A. Yes.
14 Q. On February 18th a letter was sent from Parker, Smith &
15    Feek, "Enclosed is a certificate of insurance. Your
16    insurance program complies with the insurance requirements
17    contained in the contract except for the following," and
18    you call out the material change issue that you've
19    testified to already?
20 A. Correct.
21 Q. It's signed by an Amy of your office?
22 A. Yoroshamian.
23 Q. Okay. Did you read and approve this letter?
24 A. I don't know if I read it prior to her signing it or not.
25 Q. Did you do anything to assure that, in fact, the insurance

Page 138

1 was enforced from April 1, '04, through '05.
2     The contractor's commercial general liability
3 protection is a thirty-one-page form; is that correct?
4 A. Yes.
5 Q. Now, I'll represent to you in looking at some of the older
6    forms that it was once upon a time as short as twenty-six
7    pages.
8     Does that sound right?
9 A. I think that's what I saw in those files.
10 Q. In the renewal process explain to me how it comes to your
11   attention what is new for this year's policy forms as you
12   receive information from St. Paul?
13 A. Normally, it's -- the underwriter will send out
14   notification of major changes in forms, and then as part of
15   their quotation we'll provide you with additional details
16   regarding specific changes in forms or terms or conditions.
17   I mean, under all the right circumstances that's how it
18   occurs and you're informed prior to.
19 Q. Mr. Clarkson showed you in one of these dead files -- was
20   it a contract extension or policy extension form?
21 A. General liability and auto and umbrella extension forms
22   that are part of our specification.
23 Q. Right, and they were marked here.
24     MR. CLARKSON: It was one of the
25   later exhibits.

Page 139

1     MR. SUTHERLAND: Nos. 20 through
2 23 were all the same languages.
3     What exhibit number are we up to?
4     THE COURT REPORTER: I just marked
5 No. 24 as the last one.
6     MR. SUTHERLAND: Okay.
7 Q. (By Mr. Sutherland) Would it normally be in this back
8   file?
9 A. Yes.
10 Q. I'll get around to it some other way perhaps.
11     MS. KILLIAN: Can you help him out
12 here?
13     THE WITNESS: Can I?
14     MS. KILLIAN: Well, I just wanted
15 to speed up the process.
16     MR. SUTHERLAND: Let's take a
17 break. Oh, wait, I found it.
18     MR. CLARKSON: Did we mark it?
19     MR. SUTHERLAND: No, we did not
20 mark it but we're going to now.
21
22     (Exhibit No. 25 was marked.)
23
24 Q. (By Mr. Sutherland) I'm going to show you from the '02-'03
25   policy what we have marked as Exhibit 25, the "General

Page 140

1 Liability Extension."
2     I take it these are different options that an insured
3   might want to have?
4 A. Correct.
5 Q. The form itself under letter -- what is that letter? --
6 A. O.
7 Q. -- you've marked a box "Additional Insured Form" and that's
8   printed?
9 A. Correct.
10 Q. Who has written "St. Paul Blanket, Form G0322" either by
11   name or kind of function?
12 A. I'm not sure. It would appear that it's -- it would appear
13   that it's Vickie Hanekow, the underwriter from St. Paul
14   Travelers, or it would have been St. Paul in those days.
15 Q. So she's written in --
16 A. I believe that she's made her notations on the forms that
17   we sent because -- the reason I believe is it's her
18   handwriting right here, her signature (indicating).
19 Q. You're pointing --
20 A. On here, for instance, on Item C she says, "Not applicable,
21   not excluded in our form."
22 Q. Okay.
23 A. So I believe these are underwriter notes that Vickie made
24   and provided to us.
25 Q. So are you fairly confident, based on your familiarity with

Page 141

1   the forms that were available, that it isn't Parker, Smith
2   & Feek that's spelling out that's what they want?
3 A. Parker, Smith & Feek is saying additional insured form and
4   then Vickie has added in "St. Paul blanket," and then the
5   form number.
6 Q. Was Parker, Smith & Feek in a position with St. Paul during
7   these policy periods, '02-'03 or '03-'04 or '04-'05 to
8   request a different form other than that?
9 A. There was no different form other than that.
10 Q. All right.
11 A. That was the blanket form intended for everybody.
12 Q. Is there any form that is geared toward a
13   buyer/seller/vendor/vendee relationship that would be
14   potentially applicable in a sales setting?
15 A. Not that I'm -- not that I was aware of at that time nor
16   when St. Paul Travelers underwriting was questioned were
17   they able to state that there was anything other than that
18   blanket.
19 Q. And when you say, "when St. Paul was questioned," are you
20   talking about after the loss in this case?
21 A. Yes, at the claims meeting in October of 2005 when the
22   subject of the additional insured endorsement came up.
23 Q. So this Parker, Smith & Feek general liability extension
24   form, you could send that to any one of a number of
25   different companies.

Page 146

1  MS. KILLIAN: Object to the form.
2  Q. (By Mr. Sutherland) And by "and the like" I meant just
3     rather than explaining if Wilder's subcontracting out the
4     pick up and delivery of the product, that they need to be
5     named as an AI for the party doing the pick up and they can
6     also have Tesoro named as an AI and so forth.
7        Did you understand the question?
8  A. Yes. I would say that Parker, Smith & Feek certainly is in
9     dialog as is St. Paul Travelers with the client on the
10    subject of any potential transfer of risk with subtier
11    contractors and suppliers.
12 Q. Now, when you were asked to name Tesoro as an additional
13    insured pursuant to the provision in the asphalt sales
14    contract, did you inquire whether there were any other
15    contracting parties involved in that pick up?
16 A. No.
17 Q. When did you believe you first learned that Wilder used
18    some other entity for that pick up?
19 A. When the claim was presented.
20 Q. Has anybody at Parker, Smith & Feek undertaken an
21    investigation to determine whether that party that did the
22    pick up -- I'm going to call them Weaver Brothers but I
23    think it might be Doyles, a subset or subsidiary --
24    MR. CLARKSON: Well, I'm not here
25    to testify but Weaver owns the equipment

Page 147

1     and Doyles is the operator.
2     MR. SUTHERLAND: Okay.
3  Q. (By Mr. Sutherland) -- whether any other entity that went
4     and did the pick up and delivery of the product had named
5     Tesoro as an additional insured on policies that might
6     respond to this death claim?
7  A. I think that that question was posed to Wilder by our
8     claims department, but that's not something that I was
9     involved in personally. It was just my understanding that
10    they had inquired of Wilder and Wilder was reviewing all of
11    their file documents to determine what, if anything, had
12    been received from either of those parties.
13 Q. All right. On Exhibit 13, on March 13, '06, you were
14    tendered this "Additional Insured-Designated Person or
15    Organization" form that you've identified previously.
16       The question was posed by Mr. Boele, "Would this form
17    achieve what you are looking for on Wilder for contracts
18    like the one that they have with Tesoro"?
19 A. Yes.
20 Q. You have characterized the G0322 form as a broad one.
21       Would you agree that that form that's part of Exhibit
22    No. 13, "Additional Insured-Designated Person or
23    Organization," at least for the person or organization
24    designated, is broader yet than the coverage granted in the
25    G0322 form?

Page 148

1     MS. KILLIAN: I'm going to object
2     to the form.
3        You can go ahead and answer it.
4  A. I don't know whether I would characterize it as broader, I
5     would want to review the final sentence here "limits only
6     with respect to liability arising out of your acts or
7     omissions." I'm not sure whether that would be considered
8     broader or more limiting by virtue of that language.
9  Q. (By Mr. Sutherland) And that's contrasted with "liability
10    arising out of your work for the person or organization"?
11 A. Correct, uh-huh, yeah.
12 Q. It's your testimony, though, that during the time period
13    that St. Paul was writing the policy and it was on the St.
14    Paul paper you couldn't have this language as part of the
15    St. Paul form?
16 A. That's what they tell me. And, actually, because that form
17    is an insurance services office, an ISO form, I don't know
18    that St. Paul legally could have attached this endorsement
19    to their policy. But they tell me that no similar
20    endorsement existed and -- nor was it necessary because of
21    the blanket additional insured.
22    MR. SUTHERLAND: A number of these
23    documents weren't marked, and I assume
24    they weren't marked because they weren't
25    important, but I need to look through

Page 149

1     them, I haven't had a chance.
2        Maybe we can go off the record, if
3     you want to take a break, and I can take
4     a look at them.
5     MS. KILLIAN: Okay.
6
7                    (A twenty-minute recess
8                    was taken at 3:27 p.m.)
9
10 Q. (By Mr. Sutherland) I've shown you the Endorsement G0322
11    form and given you the opportunity to review it, which is
12    part of Exhibit 4, and I think we've established it's also
13    the same language that was earlier delivered to Tesoro with
14    the certificate of insurance in February under Exhibit 3,
15    and I've also given you the opportunity to review the
16    policy that's been made Exhibit 5.
17       I would ask you, if you could, explain your conclusion
18    of how Tesoro qualifies as an additional protected person
19    under that endorsement as you read the policy.
20 A. Okay. I believe that Tesoro qualifies under the section of
21    the additional insured endorsement which says, "The person
22    or organization is an additional insured as required by a
23    contract or agreement entered into by you," and then goes
24    on to say, "but only for covered injury or damage arising
25    out of your work for that person or organization."

38 (Pages 146 to 149)